Lesley A. **PARKINS**, Plaintiff–Appellant,

v.

**CIVIL CONSTRUCTORS OF ILLINOIS, INC., d/b/a The Helm Group, Inc.,** Defendant–Appellee.

No. 98–1687.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 22, 1998.

Decided Dec. 30, 1998.

Annice M. Kelly (argued), Ernest T. Rossiello, Rossiello & Associates, Chicago, IL, for Plaintiff–Apellant.

Gregory J. Schroedter (argued), Bell, Boyd & Lloyd, Chicago, IL, Ann M. Dittmar, McGreevy, Johnson & Williams, Rockford, IL, for Defendant–Appellee.

Before BAUER, MANION, and EVANS, Circuit Judges.

MANION, Circuit Judge.

Truck driver Lesley Parkins sued her employer, Civil Constructors of Illinois, Inc., under Title VII, alleging hostile environment sexual harassment and retaliation. The district court granted summary judgment for Civil Constructors because it promptly remedied any harassment and because Parkins failed to establish a prima facie case of retaliation. On appeal, Parkins contends that because she complained to her superior, the district court should have imputed notice of her harassment to Civil Constructors, and also that two of her purported harassers were supervisors and not co-employees. With respect to her retaliation claim, she argues that she presented sufficient evidence to establish a prima facie case and pretext. We affirm.

## I. Background

We recount the facts in the light most favorable to Parkins. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Parkins began working as a six-wheel dump-truck driver for Civil Constructors—a construction and paving company—in June 1994. Her duties entailed hauling construction materials and debris to and from the work sites. During her two-plus years of employment with Civil Constructors, some of her co-workers subjected her to foul language, sexual stories and innuendos, and eventually touching. Parkins complained to her dispatcher, Tim Spellman, and to one of her purported harassers, Robert Strong. Although she saw the superintendent in charge of her division and Civil Constructors' EEO officer almost every day, she did not complain to them until August 1996. Around that time, five of Civil Constructors' employees harassed Parkins by bringing a pornographic picture to work, making sexually suggestive comments, and grabbing her on two occasions. On August 23, 1996, Parkins filed a grievance with her Union—Teamsters Local 325—complaining of sexual harassment. The Union contacted the president and EEO officer of Civil Constructors, Bruce Helm, and he immediately launched an investigation. After Civil Constructors' investigators spoke with Parkins, the five alleged harassers, and more than twenty employees, Civil Constructors concluded that Parkins had been harassed, although she had instigated some of the conduct. Accordingly, Civil Constructors punished the employees: one received a verbal reprimand, three received one-week suspensions without pay, and one received a three-week suspension without pay, which resulted in lost wages of almost $5,000. Civil Constructors also informed them that any further complaints of harassment would result in their termination.

Parkins concedes that she was never harassed again, although her co-workers began ignoring her and were not as friendly as before. As her work was seasonal, Parkins continued working for Civil Constructors until the end of the construction season when, in accordance with Civil Constructors' seniority retention policy, she and another junior dump-truck driver were laid off on November 14, 1996. This was about the same time Civil Constructors had laid her off in previous years. Subsequently, all of the more senior six-wheel dump-truck drivers were laid off by November 22, 1996. During the winter layoff, Civil Constructors sold its aging fleet of six-wheel dump-trucks, negating the need to recall all of the drivers. Consequently, in the spring of 1997, the three most junior truck drivers (a group which included Parkins) were not called back to work; rather, drivers with greater seniority were recalled.

On November 11, 1996, Parkins filed a charge of discrimination with the Illinois Department of Human Rights and Equal Employment Opportunity Commission and initiated this lawsuit on January 17, 1997. The district court granted summary judgment for the defendant, concluding that Parkins purported complaints of harassment to Spellman and Strong could not be imputed to Civil Constructors, as they were low-level employees. Additionally, it concluded that none of her harassers was a supervisor. Because Civil Constructors had no notice of the harassment until August 1996, at which time it took prompt corrective action, Civil Constructors was not liable for the harassment as a matter of law. With respect to the retaliation claim, the court observed that

Parkins failed to establish the causation element of a prima facie case.

## II. Discussion

### A. Standard of Review

We review the district court's grant of summary judgment de novo. *Rodriguez v. City of Chicago,* 156 F.3d 771, 775 (7th Cir. 1998). The record is reviewed in the light most favorable to the nonmoving party and we draw all reasonable inferences in her favor. *Vanasco v. National–Louis Univ.,* 137 F.3d 962, 965 (7th Cir.1998). Summary judgment is appropriate if the pleadings, depositions, answers to the interrogatories, affidavits, and admissions on file show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Rodriguez,* 156 F.3d at 775. We may affirm on any ground for which there is support in the record. *Diersen v. Chicago Car Exch.,* 110 F.3d 481, 487 n. 5 (7th Cir.1997).

### B. Hostile Environment Sexual Harassment Claim

Title VII provides that "[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Sexual harassment which is so " 'severe or pervasive' as to 'alter the conditions of the victim's employment and creates an abusive working environment' violates Title VII." *Faragher v. City of Boca Raton,* ⸺ U.S. ⸺, ⸺, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotations omitted)). In order to establish a prima facie case of hostile environment sexual harassment, a plaintiff must show that: (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work perfor-

mance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability. *Rennie v. Dalton,* 3 F.3d 1100, 1107 (7th Cir.1993); *see Guess v. Bethlehem Steel Corp.,* 913 F.2d 463, 465 (7th Cir.1990). The district court granted summary judgment based on Parkins' failure to establish the fourth prong of a prima facie case.

#### 1. Basis for employer liability.

An employer's liability for hostile environment sexual harassment depends upon whether the harasser is the victim's supervisor or merely a co-employee. *Faragher,* ⸺ U.S. at ⸺ ⸺, 118 S.Ct. at 2292–93; *Guess,* 913 F.2d at 465. Harassment "by co-workers differs from harassment by supervisors...." *Hunter v. Allis–Chalmers Corp.,* 797 F.2d 1417, 1422 (7th Cir.1986). Where the harasser is a supervisor and the victim suffered no tangible employment action, an employer is strictly liable, although there is the possibility of an affirmative defense. *Faragher,* ⸺ U.S. at ⸺, 118 S.Ct. at 2293. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth,* ⸺ U.S. ⸺, ⸺, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998). Because employers do not entrust mere co-employees with any significant authority with which they might harass a victim, employers are liable for a co-employee's harassment only "when they have been negligent either in discovering or remedying the harassment." *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir.1997); *accord Baskerville v. Culligan Int'l Co.,* 50 F.3d 428, 432 (7th Cir.1995). An employer's legal duty in co-employee harassment cases will be discharged if it takes "reasonable steps to discover and rectify acts of sexual harassment of its employees." *Id.*

In the present case, Parkins alleges that two of her harassers were supervisors. Specifically, she argues that foremen Strong and Charles Boeke ("Boeke") periodically func-

tioned as her supervisors when she was present on job sites where they were working. Civil Constructors, on the other hand, contends that Strong and Boeke were low-level employees who enjoyed little or no supervisory authority. Accordingly, we must determine the essential attributes of a supervisor for purposes of determining employer liability, and assess whether Civil Constructors endowed Strong and Boeke with these characteristics.

Initially, we note that Title VII provides no definition of the term "supervisor." Because of this, our understanding of the term must be guided by the common law of agency and the purposes of Title VII. *Faragher,* —— U.S. at ——, 118 S.Ct. at 2285; *Meritor,* 477 U.S. at 72, 106 S.Ct. 2399. At the outset, the Supreme Court has made clear that heightened liability exists in this context only because a supervisor's conduct is made possible by the "abuse of his supervisory authority," his apparent authority, or because his supervisory position aided him in accomplishing the harassment. *Faragher,* —— U.S. at ——, 118 S.Ct. at 2290 (citing *Restatement (Second) of Agency* § 219(2)(d) (1958)) ("in implementing Title VII it makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by use of his supervisory authority ...."); *Karibian v. Columbia Univ.,* 14 F.3d 773, 777 (2d Cir.1994) (strict liability is imposed on employers for *quid pro quo* harassment because the harasser wields the employer's authority to alter the terms and conditions of employment). For present purposes, we also keep in mind that this heightened liability exists because the "acts of supervisors have greater power to alter the environment than acts of co-employees generally ...." *Faragher,* —— U.S. at ——, 118 S.Ct. at 2292. In short, because liability is predicated on misuse of supervisory authority, the touchstone for determining supervisory status is the extent of authority possessed by the purported supervisor. *See Wright–Simmons v. City of Oklahoma City,* 155 F.3d 1264, 1271 (10th Cir.1998) (the operative question in determining supervisory status is whether the employee in question "had sufficient control over the plaintiff to be considered her supervisor ...").

We have consistently distinguished employees who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers. *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 536 n. 19 (7th Cir.1993) ("if someone in the employer's decisionmaking hierarchy engages in harassment, the employer may be held liable ...", but not when the supervisor is at such a low level that he would not be the company's agent). Before the rule of employer liability was established in *Ellerth* and *Faragher,* this and other circuits made an effort to maintain a line between low-level supervisors who were the equivalent of co-workers and supervisors whose authority and power was sufficient to make consequential employment decisions affecting the subordinate, such that the supervisor was effectively acting on the employer's behalf.[1] In light of our distinction between low-level supervisors (who are equivalent to co-employees for purposes of Title VII) and true supervisors, the question, then, is how much or what kind of authority must an individual possess to be a true supervisor.

---

1. Prior to *Ellerth* and *Faragher,* we and the other circuits defined the essential attributes of a supervisor for purposes of a claim of hostile environment sexual harassment under Title VII. *Volk v. Coler,* 845 F.2d 1422, 1436 (7th Cir.1988); *see Pfau v. Reed,* 125 F.3d 927, 937 (5th Cir. 1997); *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 803 (6th Cir.1994). Like our present definition, we stated that a defendant "is 'strictly liable for sexual harassment by supervisory personnel who have the power to hire, fire or promote ....'" *Volk,* 845 F.2d at 1436; *accord Wathen v. General Elec. Co.,* 115 F.3d 400, 405 (6th Cir.1997); *Haynes v. Williams,* 88 F.3d 898, 899 (10th Cir.1996) (supervisor is an individual who serves in a supervisory position and exercises significant control over the plaintiff's hiring, firing or conditions of employment); *Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir. 1993) (an employer is liable for harassment by a "supervisor with significant control over plaintiff's hiring, firing, or conditions of employment"); *Swentek v. USAIR, Inc.,* 830 F.2d 552, 558 (4th Cir.1987) (although pilots exercised some authority, it did not include the authority to "hire, fire, promote, or demote flight attendants"); *see Yates v. Avco Corp.,* 819 F.2d 630, 636 (6th Cir.1987) (the employer is liable for hostile environment sexual harassment carried out "by someone with the authority to hire, fire, promote and discipline the plaintiffs").

■ Cases subsequent to *Faragher* and *Ellerth* indicate that whether an individual is "a supervisor with immediate (or successively higher) authority" is dependent upon whether his authority was of a substantial magnitude. *See, e.g., Deffenbaugh–Williams v. Wal–Mart Stores, Inc.*, 156 F.3d 581, 592 (5th Cir.1998) (employee was victim's supervisor under *Faragher* and *Ellerth* where he had the authority to discharge her); *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 888 (8th Cir. 1998) (harasser, who was the store manager, was a supervisor based on the authority he had over the plaintiff). The Fourth Circuit has recently held that the *Ellerth–Faragher* standard of liability applied where the harasser "could hire and fire sales representatives," such as the plaintiff. *See Lissau v. Southern Food Serv., Inc.*, 159 F.3d 177, 179 (4th Cir.1998). Hence, it is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes imputing liability to the employer.

■ Applying this standard to the present case, it is clear that neither Strong nor Boeke was a supervisor for purposes of imposing strict liability on the employer under Title VII. Both Strong and Boeke were laborers who were required to account for their time on a time card, were paid an hourly wage, and received overtime pay. Neither Strong nor Boeke ever substituted for a superintendent. Although both frequently worked as foremen, they also served in positions in which they did not function as foremen. Boeke testified at deposition that "I'm a foreman when they have work, my type of work, otherwise I'm just a laborer, I just labor, and if they need me, then I'm a foreman for them." The type of work for which he was a foreman was "underground piping." Similarly, Strong testified that he does not even work for Civil Constructors all year. Rather, he works six or seven months a year, sometimes as a foreman and other times as a truck driver. Furthermore, both were members of labor unions. Boeke was a member of the Laborers Union Local 722

and Strong was a member of the Teamsters Union Local 325. Foremen or crew chiefs do not decide what work is to be *done* at a site and do not have the authority to decide how many employees will be assigned to their crews, although they can request more employees. Additionally, any authority they had over Parkins was tenuous at best, because she did not work exclusively at the same sites at which Strong and Boeke worked. Rather, she worked with approximately ten foremen at various sites. Besides that, she was not a laborer on site; she drove a truck, delivering and transferring loads of dirt and other materials. At most, Boeke and Strong would tell her where to dump or pick up a load.

Like Parkins and the other truck drivers, foremen answer to a superintendent who makes all of the significant decisions and evaluates employees. Furthermore, their authority was so limited that they did not assign employees to particular sites and could not require Parkins' presence on a job site. Strong described himself as a "glorified timekeeper," and said of his duties, "[I][j]ust tell my trucks where to go and what to bring as far as materials and keep track of my laborer and operator's time." Boeke characterized his job in similar terms:

Q. And so when there's [sic] truck drivers on one of your sites, do you supervise them as well?

A. Yes, I have to—they come into my job and I tell them where to dump, or if I've got them dumping, if I wanted them to move from dumping this area or that area, that's supervision, I guess, if that's what you call it.

Q. Okay. You just tell them where to dump the material?

A. Where to dump, or they usually dump and they might stop me and ask me if I've got enough loads there where they should put more or something like that.

C. Boeke Dep. pp. 10–11.

Civil Constructors President and EEO Officer Bruce Helm also testified about the limited authority of foremen:

Q. Is the foreman ever considered the immediate supervisor?

A. No.

Q. Why not?

A. Because trucks come and go on crews.

Q. Okay.

A. They don't ever ...

Q. So the foremen don't supervise the truck drivers on their crew?

A. No....

Bruce Helm Dep. p. 118. Finally, Strong stated that he had little contact with truck drivers, but instead communicated with them by means of a radio. In light of these facts, it is not surprising that Strong and Boeke also lacked the authority to hire, fire, promote, demote, or discipline employees. Like all other employees, they can recommend that Civil Constructors discharge another employee, but the discretion to terminate is entrusted to superintendents. Although Parkins claims that Boeke once bragged about his ability to have employees fired, even if his boast were accurate, this does not elevate him to supervisory status. *See Pfau*, 125 F.3d at 937 (employee was not supervisor where he only had the authority to recommend that employees receive awards or be subject to disciplinary action). Because there is no evidence that either Strong or Boeke enjoyed more than minimal authority, and exercised almost no control over truck drivers, they clearly were not supervisors with immediate or successively higher authority. Moreover, no reasonable person could have believed that Strong or Boeke were endowed with this supervisory authority. Because of this, any complaints to them of harassment would be futile. Accordingly, Civil Constructors' liability for the purported harassment must be determined according to the standard for co-employees.

2. Notice or knowledge of harassment.

▆▆▆▆ As mentioned above, employers are liable for a co-employee's harassment only when they have been negligent either in discovering or remedying the harassment. *Perry*, 126 F.3d at 1013. An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment by its employees. *Baskerville*, 50 F.3d at 432. Of course, it "would be unrealistic to expect management to be aware of every impropriety committed by every low-level employee." *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir.1994). Thus, notice or knowledge of the harassment is a prerequisite for liability. *Perry*, 126 F.3d at 1014. In determining whether an employer had notice of harassment, we first determine whether the employer has designated a channel for complaints of harassment. *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir.1997). Where an employer sets up a "point person" to accept complaints, "this person becomes the natural channel for the making and forwarding of complaints, and complainants can be expected to utilize it in the normal case." *Young*, 123 F.3d at 674. Where a point person was not identified or easily accessible, an employer can receive notice of harassment from a "department head" or someone that "the complainant *reasonably believed* was authorized to receive and forward (or respond to) a complaint of harassment." *Id.* With respect to the extent of the notice given to an employer, a plaintiff "cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir.1996).

▆▆▆▆ Here, Parkins contends that Civil Constructors did not effectively act to correct sexual harassment after she made complaints to Bruce Helm (via the Teamsters Union) in August 1996, and to Spellman and Strong in 1994 and 1995. We first address the complaint to Helm. Parkins argues that her complaint to the Teamsters Union, which was quickly conveyed to Helm, failed to elicit an effective response from Civil Constructors. Parkins was a member of the Teamsters Union and her employment relationship with Civil Constructors was governed by a collective bargaining agreement. In Article Fifteen of that agreement, Civil Constructors agreed that it would not "discriminate against any individual with respect to their hiring, compensation, terms or conditions of employment because of such individual's race, color, religion, [or] sex ....." Article

Six of the agreement further provides that employees could file a grievance with the Union concerning any violations of the agreement. No action by the employer is required, however, "on employee complaints as to wages and working conditions unless made within ten (10) working days of the supposed violation." Despite this ten-day limitation, Parkins filed a written grievance with Teamsters Union Representative Michael Munz on August 23, 1996, complaining of harassment "over this construction season from July to this date by the companies [sic] foremen and employees on several occasions." Munz contacted Bruce Helm, who immediately launched the investigation described above. Civil Constructors then promptly punished the harassers and threatened them with termination, and even Parkins concedes that the harassment ceased. Although she complains that Civil Constructors' efforts could have been more thorough, its investigation and punishment of the harassers was "both timely and reasonably likely to prevent the conduct underlying her complaint from recurring." *Saxton*, 10 F.3d at 535. Nothing more is required. Indeed, despite Parkins' complaints, the law does not even require that the employer's actions prevent harassment, but merely that its response was reasonably likely to prevent future harassment. *See Saxton*, 10 F.3d at 536. In fact, the harassment stopped immediately; Civil Constructors' remedial efforts succeeded in achieving a very positive result. Accordingly, the district court properly found that Civil Constructors incurred no liability because it properly responded to Parkins' complaint of August 1996.

■ Parkins, however, also argues that Civil Constructors was negligent in failing to prevent the acts of harassment that led to her August 1996 complaint (which occurred in July and August 1996), and that Civil Constructors did not prevent and correct harassment that occurred prior to the July–August 1996 incidents.[2] She bases this argument on the fact that, despite verbal complaints to Strong and Spellman in 1994 and 1995, Civil Constructors took no corrective action.[3] Essentially, she contends that by virtue of these complaints, notice of harassment should be imputed to Civil Constructors.

We must first determine whether Civil Constructors had a designated channel for complaints. *Young*, 123 F.3d at 674. Civil Constructors, indeed, has a sexual harassment policy which defines sexual harassment, prohibits such conduct, and sets forth a conduit for complaints. The policy states in relevant part: "If an employee believes that he or she is being subjected to sexual harassment, this information should promptly be reported to the immediate supervisor. All such complaints will be taken seriously and an immediate investigation will be made." Parkins, however, contends that she never saw this policy and disputes whether it existed before her complaints of harassment. Regardless, this was not the only designated avenue for complaints. As mentioned above, there existed another channel for complaints under the Collective Bargaining Agreement: filing a grievance with the Teamsters Union, an option which Parkins eventually exercised.

■ For whatever reasons, prior to August 23, 1996, she did not use this alternative procedure (i.e., filing a grievance with the Union). To avoid the ramifications of this non-use, she now argues that, because Civil Constructors' sexual harassment policy pro-

---

**2.** Most of these incidents occurred in 1994 and 1995, well outside the 300 days prior to her filing of a charge of discrimination. *See* 42 U.S.C. § 2000e–5(e). Any act occurring outside the filing period "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). At oral argument, Parkins argued for the first time to this court that she was subjected to a continuing violation and that this court should

consider harassment even if it were remote in time. Arguments presented for the first time on appeal, however, are waived. *Hoeller v. Eaton Corp.*, 149 F.3d 621, 625 (7th Cir.1998). Accordingly, because Parkins filed her charge of discrimination on November 11, 1996, and failed to state allegations supporting a continuing violation before the district court, she cannot maintain a cause of action for any conduct that occurred before January 15, 1996.

**3.** Both Spellman and Strong deny that Parkins ever complained to them.

vided for complaints to her supervisor, she was precluded from filing a grievance with the Teamsters Union. For someone who claims not to have seen this policy, it seems somewhat disingenuous to insist that the unknown policy prevented her from filing an earlier complaint with the Union. In any event, Parkins provides no support for her argument that an employer's designation of one avenue for complaints in its sexual harassment policy forecloses the possibility of making complaints elsewhere. *Cf. Young*, 123 F.3d at 675 (noting that the employer had four authorized channels for lodging complaints). But even if Parkins had some support for this view, we would reject it as being contrary to the policies and goals of Title VII. "Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms." *Ellerth*, ⸺ U.S. at ⸺, 118 S.Ct. at 2270. Rather than criticize, we should encourage any employer who constructs multiple mechanisms for detecting and correcting harassment.

Because Parkins apparently delayed using the only mechanism for complaint that indisputably existed (filing a grievance with the Teamsters Union), we must determine whether she reported the alleged harassment to anyone who had the authority to deal with the harassment or at least "to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Young*, 123 F.3d at 675. The only two people whom Parkins identifies as recipients of her complaints are Spellman and Strong. With respect to Strong, he was a mere foreman who lacked the ability to correct the harassment (other than refraining from his own acts, of course), due to his limited authority discussed above. *See Williamson v. City of Houston*, 148 F.3d 462, 466 (5th Cir.1998) (the key issue in determining notice to the employer under the Seventh Circuit holding in *Young* is whether notice was given to those with authority to address the problem). Obviously, it is unreasonable to expect that Strong would transmit complaints about himself to Civil Constructors' management. Thus, Civil Constructors had no imputed notice of the harassment by means of Parkins' complaints about Strong which she made to Strong.

With respect to the dispatcher, Tim Spellman, Parkins contends that he also was her supervisor. It is clear, however, that Spellman also lacked the authority to correct the harassment, had no authority to address grievances, and no authority to terminate or discipline the harassers. He was a dispatcher of trucks who, like Parkins, answered to Superintendent Craig Williams. The only question, then, is whether Spellman's limited authority and attributes could reasonably cause an employee to believe that he would refer or had a duty to refer a complaint of harassment to someone with authority to address it. *See Young*, 123 F.3d at 674.

Spellman was a former Teamsters Union member who daily assigned truck drivers to assist the various construction crews. Civil Constructors terminated him in 1996 due to his lackluster performance. Although Parkins testified that Spellman "hired" her, the evidence indicates that Spellman called the Teamsters Union hall and requested that they send truck drivers to Civil Constructors. Under the collective bargaining agreement, Civil Constructors is not allowed to hire truck drivers off the street, and it conducts no interviews of candidates, including those sent by the Teamsters Union. Spellman only called the Teamsters Union to request drivers when instructed by Superintendent Williams, Bruce Helm, or Civil Constructors' Treasurer Gene Duray, and only in accordance with the collective bargaining agreement. With respect to Parkins' hiring, Bruce Helm ordered that they request a woman and a black driver from the Union so that Civil Constructors could meet a hiring quota. Thus, whatever authority Spellman possessed did not entail the power to hire.

Furthermore, Spellman exercised no discretion or decision-making authority, other than to assign drivers to the various crews and to the type of truck they drove. Even this limited authority was based on Superintendent Williams' instructions and was subject to his approval. Although Spellman occasionally admonished truck drivers whose conduct was deficient, he exercised no disciplinary authority and was not responsible for addressing disciplinary problems. Rather, Superintendent Williams was responsible for

evaluating and disciplining truck drivers. While Spellman, like all other employees, could recommend the termination of employees, he never did so. Although nomenclature is not dispositive of the issue, we also note that Spellman did not have the title "Superintendent" until about June 1996, nor did he possess the duties and authority that went with the title. In contrast, Parkins knew that Williams was a superintendent. In light of these facts, the district court properly determined that, as a matter of law, Spellman was not a person who could reasonably be expected to refer complaints of sexual harassment to the appropriate people. His limited duties and authority, coupled with Parkins' daily access to and observance of people with authority to correct the problem, made it unreasonable for Parkins to believe that Spellman was the type of employee who could be expected to convey her complaints to someone who could stop the harassment.

■ It also merits mention that, even if complaining of harassment to Spellman or Strong initially were reasonable in 1994, any reasonableness quickly evaporated when Parkins' requests for relief went unanswered. Although she cannot remember the dates on which she lodged her complaints, she alleges that her protestations occurred at least by 1994. Nevertheless, she candidly admits that her complaints to Spellman and Strong failed to alleviate the harassment. A reasonable person, realizing that her complaints were ineffective, would then seek a remedy elsewhere. Certainly a reasonable person would have complained elsewhere by 1996, the only year during which harassment occurred for which Civil Constructors could be held liable. Yet Parkins concedes that until she went to the Union, she did not complain to anyone else. Aside from the fact that Parkins could have filed a grievance with the Union, in light of the deposition testimony that Parkins saw Superintendent Williams nearly every day and frequently received orders from him, a reasonable person would have voiced her complaints to Williams. But if for some reason this avenue were unacceptable to Parkins, she also could have complained to Civil Constructors' EEO officer and president, Bruce Helm. Indeed, Parkins admitted that she knew Helm was the owner of Civil Constructors, and Helm testified that he saw and spoke to Parkins nearly every day. A reasonable employee would have taken advantage of such opportunities, especially to correct activity that was as serious as she claims, but which was not cured by complaints to Spellman. Thus, Parkins cannot seriously contend that in 1996 Spellman and Strong continued to be reasonable channels for voicing her complaints when her complaints went unheeded and so many other avenues existed. In light of Parkins' daily observance of the limited authority exercised by employees like Spellman and Strong, and her ability to compare their location in the hierarchy with those of employees who would have conveyed her complaints to the EEO officer, any belief that Spellman and Strong would be effective conduits for complaints is even more unreasonable. As we said in *Perry*, "the law against sexual harassment is not self-enforcing" and an employer cannot be expected to correct harassment unless the employee makes a concerted effort to inform the employer that a problem exists. *Perry*, 126 F.3d at 1014. Accordingly, the district court correctly held that Civil Constructors had no notice or knowledge of Parkins' harassment until August 23, 1996, and that Civil Constructors effectively corrected the harassment when complaints were made to the Union and transmitted to its EEO officer.

## C. Retaliation

Parkins also contends that Civil Constructors retaliated against her for reporting the harassment by ostracizing her, laying her off early in November 1996, and failing to recall her in April 1997.

■ Title VII prohibits retaliation against an employee who has engaged in activity protected by the Act. 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation Parkins must show that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Debs v. Northeastern Ill. Univ.*, 153 F.3d 390, 397 (7th Cir.1998). If she establishes these elements, Civil Constructors has the burden to produce a legitimate, nondiscrimi-

natory reason for its actions. Once this reason is produced, Parkins must prove that the reason is pretextual. *See id.*

We quickly dispatch Parkins' complaints about ostracism by her fellow workers. Previously, we suggested that an adverse employment action might occur when an employer orders its employees to shun the plaintiff, provided that this activity causes material harm to the plaintiff. *See McKenzie v. Illinois Dep't of Transp.*, 92 F.3d 473, 485 (7th Cir.1996); *accord Flannery v. Trans World Airlines, Inc.*, 160 F.3d 425, 428 (8th Cir.1998) (shunning is not an adverse employment action where the plaintiff did not allege that the ostracism resulted in a reduced salary, benefits, seniority, or responsibilities); *Manning v. Metropolitan Life Ins. Co.*, 127 F.3d 686, 693 (8th Cir.1997) (ostracization was not of sufficient intensity to rise to the level of an adverse employment action). In the present case, the record is devoid of any evidence that Civil Constructors ordered any of its employees not to talk to Parkins. Moreover, there is no indication that this alleged shunning resulted in material harm to Parkins. Accordingly, it does not amount to an adverse employment action. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996) ("not everything that makes an employee unhappy is an actionable adverse action"). With respect to the layoff and failure to recall, Parkins has not demonstrated a causal link between these actions and her complaints. This element is frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action. *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir.1998). Here, according to Parkins her latest complaint of harassment occurred on August 23, 1996. Civil Constructors did not lay her off, however, until November 14, 1996, and did not recall her in the Spring of 1997. This time sequence is insufficient to establish the causation prong of a prima facie case. *See id.* (temporal sequence is telling only when an adverse action follows "fairly soon" after the protected expression).

Beyond this, it also merits mention that Civil Constructors set forth legitimate, non-discriminatory reasons for its actions. Regarding the layoff, Civil Constructors demonstrated that it lays off most of its employees in the winter months due to a lack of work, and that it attempts to lay off its most senior employees last. Parkins admitted that she underwent this seasonal layoff in the Fall 1994 and 1995. On November 14, 1996, she and the other most junior truck driver were laid off. By November 22, 1996, six working days after Parkins was laid off, the remaining six-wheel dump-truck drivers were laid off.

With respect to Civil Constructors' decision not to recall Parkins in the Spring, Civil Constructors reduced its aging fleet of six-wheel dump-trucks. In recalling truck drivers, Civil Constructors is required by a collective bargaining agreement to recall by seniority all drivers hired prior to 1985. With respect to drivers hired after 1985, Civil Constructors has a policy of recalling drivers according to seniority. Notably, Parkins was not the only truck driver whom Civil Constructors did not recall; two others, one of whom had greater seniority, encountered the same fate. That is, Civil Constructors did not recall the three least senior truck drivers.

Parkins does not dispute that the recalled drivers had greater seniority, but merely asserts that on one or two occasions in years past, Civil Constructors departed from this seniority layoff and rehiring policy. This allegation is insufficient to show pretext because Civil Constructors' past divergences from a seniority recall policy do not indicate that Civil Constructors was not motivated by this policy in the 1997 recalls. Furthermore, Civil Constructors explained that although it recalled employees on the basis of seniority, sometimes employees who were recalled temporarily declined the offer to come back to work, requiring Civil Constructors to recall the next most senior employee. Furthermore, the collective bargaining agreement required Civil Constructors to recall the union steward first, regardless of his seniority. Thus, because Parkins has failed to show both that Civil Constructors' legitimate, non-discriminatory reasons are false and that discriminatory reasons actually motivated Civil Constructors, she cannot show pretext. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

Accordingly, the district court properly granted summary judgment on Parkins' retaliation claim.

### III. Conclusion

Parkins did not adduce sufficient evidence to defeat Civil Constructors' motion for summary judgment. Because her purported harassers were co-employees, Civil Constructors was subject to a negligence standard of liability and could only be held liable for negligently failing to discover or correct the sexual harassment. Parkins overlooked several avenues for complaining about the harassment. Those which she chose failed to apprise Civil Constructors of the problem until August 1996, when she complained to her Union. Upon learning of her charges, Civil Constructors immediately launched an investigation and punished the harassers. After that, no harassment occurred. As to her retaliation claim, Parkins failed to show that there was a causal nexus between her complaint of discrimination and Civil Constructors' decisions to lay her off and not to recall her. Even if Parkins had established a prima facie case of retaliation, Civil Constructors put forth legitimate, non-discriminatory reasons for its decisions, and Parkins failed to show that these reasons were pretextual. Because there were no outstanding issues of material fact, and Civil Constructors was entitled to judgment as a matter of law, summary judgment was proper.

AFFIRMED.