# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-2358

KATHY DURKIN,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 4932—**Elaine E. Bucklo**, *Judge.*

———————

ARGUED APRIL 7, 2003—DECIDED AUGUST 22, 2003

———————

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

BAUER, *Circuit Judge.* Kathy Durkin sued the City of Chicago for events arising out of her employment training with the Chicago Police Department. Durkin stated that she was sexually discriminated against, sexually harassed, and retaliated against for reporting the discrimination. She also contended the City violated 42 U.S.C. § 1983. The district court granted summary judgment for the City, from which Durkin appeals. For the reasons stated herein, we affirm.

## BACKGROUND

In May 1999, Kathy Durkin entered the Chicago Police Academy as a probationary police officer. Every probationary police officer attends the Academy for a training

program that lasts approximately four months. Recruits are trained and tested in a variety of different areas, including the handling and shooting of firearms. The State of Illinois requires all police officers to pass the Illinois Mandatory Recruit Firearms Course of Fire. To pass, a trainee must achieve a score of at least 70% on a pistol course. Recruits are given four chances to pass the firearms exam. Durkin signed two statements reflecting her understanding that she would receive no more than four opportunities to pass the test, and that failure to do so would result in termination.

During her first weeks of firearms training, Durkin's firearms instructor, Nick Pappas, berated Durkin for her poor shooting skills. He repeatedly yelled obscenities at her, and on one occasion, kicked her leg to show her the proper shooting stance. Unsurprisingly, Pappas' demeaning training techniques did not yield successful results. On August 2-3, 1999, Durkin failed the firearms test, shooting a score of 44%. Durkin received an additional three hours of training by four instructors before her second attempt, which she failed, scoring 50%.

Durkin, together with three other recruits who had also failed in their second attempts, was given ten hours of supportive training. Unlike the other three recruits, Durkin failed her third attempt, scoring 54%. After Durkin's third unsuccessful try, the Academy gave Durkin the opportunity to receive twenty additional hours of supportive training. This training consisted of one-on-one instruction with Officer James Peck.

During her training with Peck, Durkin was subjected to a pattern of offensive remarks and repulsive behavior. Early in the training, Peck told Durkin that he "could teach a fucking monkey to shoot." Later, after a satisfactory performance by Durkin, Peck noted, "look I taught a fucking monkey to shoot." Peck referred to women as "broads,"

"fucking broads," and "cunts" in Durkin's presence. When Durkin's father passed away, Peck offered his condolences by telling her "get over it, my fucking father died too . . . you don't need your fucking father."

Peck's teaching style was no less courteous. Peck made Durkin stand in a two-foot by two-foot box formed with tape on the floor of the range office. Durkin stated that he forced her to stand in the box for as long as forty minutes while Peck conversed with fellow officers. Another of Peck's highly unorthodox training methods was making Durkin do pushups immediately before shooting, a method which Peck admitted would likely decrease her strength and accuracy.

Peck's moral support did little to inspire confidence. He told Durkin that she would never pass the firearms test and that she could never make it as a police officer. In addition, he assailed her intelligence, telling her that her brain was too small and asking her "who did you fuck to get that [college] degree?"

In an attempt to resolve a scheduling conflict that had arisen between Peck and Durkin, Durkin's husband, Chicago Police Detective Patrick Durkin, met with Peck. Peck told Detective Durkin, "you have a real blonde on your hands." Peck then asked him, "is she that stupid at home?"

Shortly after this encounter, Peck asked Kathy Durkin if she had "pulled out her witch bag." After Durkin asked what he meant, Peck explained "so I hear you told your husband that you're not going to fuck him unless he came down here and talked to me."

Durkin's experience with fellow classmates was not much better. During driving school, she was in a car with two classmates when one of them, John Dolan, unzipped his pants, urinated, and said "suck this." Another classmate, Dennis Lopez, told Durkin that he wanted to get her drunk and "fuck her and lick her all over."

Amidst this behavior and her shooting difficulties, Durkin complained to an instructor, Officer Edward Griffin. Griffin perceived the complaints as stemming from her difficulties with the firearms test. His conclusion was based on the fact that Durkin's concerns centered on her shooting skills; she made no mention of Peck's behavior or any of the other episodes she experienced.

On September 4, 1999, Officer Raul Gutierrez gave Durkin additional firearms training. On September 7, 1999, Durkin made her fourth attempt. She first requested permission from Lieutenant Samuel Christian, the Commanding Officer for Recruit Training, to fire a practice round. Christian denied the request for a practice round, and Durkin shot a passing score of 72%. Christian then told her that it was only a practice round and did not count. She was forced to shoot the course again, scoring a failing 66%.

The next day, Patrick Durkin sent a letter to Police Superintendent Terry Hillard which described the language and behavior his wife experienced at the Academy. Hillard forwarded the letter to Deputy Superintendent Jeanne Clark. On September 9, 1999, Clark conducted an exit interview with Durkin. Durkin complained to Clark about the hostile environment at the Academy. However, Durkin's complaint was vague; she only identified one specific incident, Peck's "witch bag" comment. Clark opened a formal investigation of Durkin's complaint. She then sent the complaint to the Internal Affairs Division.[1] Clark also offered Durkin an additional forty hours of firearms training in Mattoon, Illinois, and a fifth opportunity to pass the

---

[1] The case was then assigned to investigator Billy McBride. In an interview with McBride, Durkin reiterated the same complaint and told McBride only about the "witch bag" comment. After two additional meetings in which Durkin declined to comment, McBride closed the investigation.

firearms test.

Durkin went to Mattoon, completed her forty hours of training, and passed the firearms test. Durkin, at that point, thought she had successfully met the Chicago Police Department's firearms requirements. Clark, however, asserts it was understood that Durkin would have to take the test in Chicago after she completed her training in Mattoon. When Durkin returned to Chicago, she was required, without advance notice, to take the test. She failed, shooting a score of 58%.

After failing on her fifth attempt, Durkin was terminated as of October 8, 1999.

Durkin sued the City of Chicago for equal protection violations under 42 U.S.C. § 1983, sexual discrimination, sexual harassment, and retaliation under Title VII. The City moved for and was granted summary judgment on all counts. Durkin appeals.

## ANALYSIS

We review the district court's grant of summary judgment *de novo*. Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### A.  Sexual Harassment

Durkin claims that the City subjected her to a hostile working environment in violation of Title VII. To prevail on her claim of sexual harassment based on hostile work environment, Durkin must show: (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was

based on her sex; (3) the sexual harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) a basis for employer liability exists. *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002). The City challenges only the fourth element.

Whether an employer is liable in a hostile environment sexual harassment action is guided by *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). These cases instruct us that the central question is whether the harasser is the victim's supervisor or merely a co-worker. *Faragher*, 524 U.S. at 805-06. However, regardless of whether we find Officer Peck qualifies as a supervisor, the City cannot be held liable because Peck took no tangible employment action against Durkin.

When a supervisor engages in sexual harassment, the employer is liable for the harassment only if the harasser took a tangible employment action as part of his harassment. *Faragher*, 524 U.S. at 807. No affirmative defense is available under *Faragher* and *Ellerth* when the supervisor's harassment culminates in a tangible employment action. Durkin contends that she was denied a tangible employment benefit-training. A discriminatory denial of job-related training can constitute an adverse employment action under Title VII. *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998).[2] However, Durkin's contention that she was

---

[2] Amicus asserts that this case should be considered under the methodology of a denial of training, as we did in *Pafford v. Herman,* 148 F.3d 658, 667 (7th Cir. 1998). However, this approach is inapplicable because Durkin was not only trained, but also the sole recipient of forty additional hours of special training in Mattoon, Illinois.

denied training is not borne out by the record. Durkin received the same course of training as the other recruits, and was not assigned to Officer Peck until after she had received the basic course of training and had taken the exam three times. She was also given five opportunities to pass the firearms exam instead of the standard four and additional training in Mattoon, Illinois. Given this factual background, we cannot agree that Durkin was denied training. In fact, the exact opposite occurred; she was given more training than the Academy customarily gives.

Since no tangible employment action was taken, Durkin must show that the City was negligent in discovering or remedying the harassment. *Parkins v. Civil Constructors*, 163 F.3d 1027, 1032 (7th Cir. 1998). An employer may defend against harassment charges by showing it exercised reasonable care to discover and rectify promptly any sexually harassing behavior. *Id.* Since an employer is not omniscient, it must have notice or knowledge of the harassment before it can be held liable. We determine whether an employer had notice of sexual harassment by considering the channel for complaints of harassment. *Hall*, 276 F.3d at 356-57. When an employer designates a "point person" to accept complaints, as the City did here, "this person becomes the natural channel for the making and forwarding of complaints, and complainants can be expected to utilize it in the normal case." *Id.* (quoting *Parkins*, 163 F.3d at 1035). Finally, for a plaintiff to survive summary judgment, she must show she provided the employer with enough information so that a reasonable employer would think there was some probability that she was being sexually harassed. *Hall*, 276 F.3d at 356.

Durkin claims the City was negligent because it failed to properly investigate her complaints about harassment. She argues the City made a "meager effort" because it merely questioned Peck and no one else. She also contends the City never corrected any of the sexual harassing behavior since

it did not punish or fire anyone.

A review of the record reveals that the City has a proper system for the making and forwarding of complaints about sexual harassment. Durkin's training included a lesson on the City's sexual harassment policies and complaint procedures. The policy provides that a Chicago Police Department member who experiences sexually harassing conduct to:

> report the incident to their immediate supervisor, by notifying the supervisor orally of the incident, no later than 180 days following the alleged incident. If the immediate supervisor is the alleged offender, the member will notify a supervisor one rank above that of the accused member.

The supervisor who receives the complaint must then contact the Office of Professional Standards, obtain a complaint register number, and submit a written report to the Internal Affairs Division. The Internal Affairs Division must then investigate the allegations.

A sexual harassment policy must provide for "effective grievance mechanisms" and have a "meaningful process" for employees to seek redress for their concerns. *Gentry v. Export Packaging Co.*, 238 F.3d 842, 847 (7th Cir. 2001). The City has a reasonable mechanism for detecting and correcting harassment. However, Durkin did not avail herself of the procedure. Probationary officers at the Academy are directed to make complaints of sexual harassment to their homeroom instructor. Durkin failed to tell her homeroom instructor, Officer Smith, about the sexual harassment because he was Peck's friend and she believed it would be "futile." Durkin's feelings of futility or unpleasantness do not alleviate her duty to bring her mistreatment to the City's attention. *See Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999). An employer is not liable for co-employee sexual harassment when a mechanism to report the harassment exists, but the victim fails to utilize

it. *Murray v. Chi. Transit Auth.*, 252 F.3d 880, 889 (7th Cir. 2001). Durkin points out that her failure to broach the subject with her homeroom instructor is not fatal because she complained to many people at the Academy. While there could be instances where this approach is sufficient to put an employer on notice, this is not one of them. Durkin's complaints were vague; she never expressed her feelings of harassment or offered any specific examples of what she considered harassing or demeaning conduct. Instead, she complained about matters that were not sexual in nature such as Officer Pappas kicking her to correct her stance and her troubles with the firearms test. The ubiquitous nature of her complaints did not shed light upon the abusive behavior or demoralizing feelings she was experiencing. The City simply was not provided with enough information to create some probability that it would think Durkin was being sexually harassed. For these reasons, the City was not negligent in discovering or remedying the harassment.

Finally, Durkin argues that the district court did not properly consider the totality of the circumstances in determining whether a hostile work environment existed. *See Mason v. Southern Ill. Univ. at Carbondale*, 233 F.3d 1036, 1044-45 (7th Cir. 2000). She points out that the harassment was persistent and pervasive, yet the district court analyzed the incidents in a piecemeal fashion. However, reviewing the totality of the circumstances reveals boorish conduct and unexplained animosities toward Durkin, but not to the extent that it meets the legal requirements of Title VII.

## B. Sexual Discrimination

Durkin also avers that the City sexually discriminated against her because instructors made offensive comments based on her gender and treated her differently than the male recruits. A plaintiff seeking to prove gender discrimi-

nation may either offer direct or circumstantial evidence of discrimination or provide indirect evidence through the framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lim v. Trs. of Ind. Univ.*, 297 F.3d 575, 580 (7th Cir. 2002). Durkin offers no direct or circumstantial evidence that she was terminated because of her gender and so we examine her claim under the *McDonnell Douglas* burden-shifting framework. Under *McDonnell Douglas*, a plaintiff establishes a prima facie case of sex discrimination if she demonstrates that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate employment expectations; (3) in spite of meeting the legitimate employment expectations of her employer, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated male employees. *Markel v. Bd. of Regents of the Univ. of Wis. Sys.,* 276 F.3d 906, 911 (7th Cir. 2002). The district court determined that Durkin's harassment claim failed because no evidence existed that similarly situated male employees were treated more favorably than she. We agree.

To show that another employee is "similarly situated," a plaintiff must show that there is someone who is comparable to her in all material respects. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). We consider all relevant factors to determine whether two employees are similarly situated. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). Durkin must show that she was not different from her male counterparts with respect to performance, qualifications, or conduct. *Id.*

Durkin contends that there were no similarly situated male employees in her class because she was the only recruit from her class who failed the firearms exam. Durkin argues that she was treated less favorably than similarly situated males because Peck did not demean or intimidate male recruits. We are unpersuaded by either argument.

Durkin's argument that Peck did not insult males is simply a recycled version of her harassment claim which we have denied. Durkin's other contention is also rejected because as the district court correctly noted, Durkin "cannot meet her burden by pointing to an absence of *any* similarly situated male recruits." *Durkin v. City of Chicago*, 199 F. Supp. 2d 836, 845-46 (N.D. Ill. 2002) (emphasis in original). It is her duty to prove the City treated similarly situated male employees more favorably. *See Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1087 (7th Cir. 2000). Durkin has pointed to no evidence of male employees who were similarly situated to her, indeed, in her reply brief, she says there were no similarly situated male employees. The district court's decision to grant the City's motion for summary judgment of this claim was appropriate.

## C. Retaliation

Durkin next asserts that the City fired her in retaliation for complaining about her experiences at the Academy. Title VII forbids an employer from punishing an employee for complaining about discriminating treatment in the workplace. 42 U.S.C. § 2000e-3(a). Retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). A plaintiff has two ways to establish a prima facie case of retaliation, the direct method and the indirect method.[3]

---

[3] Durkin contends there is an inconsistency in this Circuit's precedent as to whether circumstantial evidence can be presented under the direct method. *See Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002), *cert. denied*, 123 S. Ct. 79 (2002) (plaintiff under the direct method must "present direct evidence (evidence that establishes without resort to inferences

(continued...)

*Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003). However, we need not undertake this analysis as Durkin's claim fails at the outset.

Durkin must show she engaged in statutorily protected activity*. Hilt-Dyson*, 282 F.3d at 465. Usually a claim for retaliation is preceded by an obligatory complaint about discriminatory conduct, so that the employer is aware of the mistreatment and the corresponding protected activity. Unsurprisingly, there is a dearth of case law on this point.[4]

It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in statutorily protected activity. While we have held that an employee may engage in protected activity under § 2000e-3(a) even if the conduct at issue does not violate Title VII, *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994), we have never held that an employer can retaliate when there has been no protected expression. An employer cannot retaliate if there is nothing for it to retaliate against.

---

[3] (...continued)
from circumstantial evidence) that [a plaintiff] engaged in protected activity"). *Id.* at 644. *But see Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003), ("[t]he second type of evidence permitted under the direct method is circumstantial evidence; i.e., evidence that allows a jury to infer intentional discrimination by the decisionmaker"). Since the issue is not material to the outcome of this case, we decline to address the question.

[4] The Second and Ninth Circuits both explicitly make proof of the employer's knowledge part of the prima facie case of retaliation. *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2nd Cir. 1998); *Gifford v. Atchison, T.&S.F.R. Co.*, 685 F.2d 1149, 1155 (9th Cir. 1982). We have assumed that this aspect is implicit in the first element of this Circuit's prima facie case under the indirect methodology.

As we have previously noted, Durkin never complained about sexual harassment through the formal channels of the City's complaint mechanism. We agree with Durkin's sentiment that the record is replete with examples of her complaints. However, her complaints were vague and concerned subject matters other than harassment. Moreover, she did not utilize the City's policy for reporting harassment because she believed it would accomplish nothing. It was not until September 9, 1999 that Durkin requested a meeting with Clark. Durkin never engaged in statutorily protected expression until this meeting. When she did engage in protected activity, lodging a complaint with Clark, Clark acted on her own authority and provided Durkin with another, meaningful opportunity to pass the firearms exam. When Durkin returned to Chicago, she took the exam and shot a 58%, a failing score.

### D. 42 U.S.C. § 1983

Finally, Durkin claims that under 42 U.S.C. § 1983, the City is liable because a person with final policy making authority caused her constitutional injury. However, a municipality cannot be found liable if there is no finding that the individual officer is liable on the underlying substantive claim. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam). Since Durkin did not suffer a constitutional injury, she has no claim against the municipality. *Pasiewicz v. Lake County Forest Pres. Dist.*, 270 F.3d 520, 527 (7th Cir. 2001).

### CONCLUSION

While we expressly condemn the conduct Durkin was subjected to, she cannot prevail because she does not meet the requirements set forth in *McDonnell Douglas*. Moreover, in the future, we expect the City to better monitor the workplace such that the atrocious behavior exemplified in this case is not allowed to fester.

No. 02-2358

AFFIRMED.


A true Copy:

        Teste:


                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*