Elizabeth M. SCHELE, Plaintiff,

v.

**PORTER MEMORIAL HOSPITAL,**
**et al., Defendants.**

No. 2:00–CV–153.

United States District Court,
N.D. Indiana,
Hammond Division.

Sept. 4, 2001.

Ivan E. Bodensteiner from Douglas &
Ferngren, Daniel R. Berning from Bern-

ing & Berning, Valparaiso, IN, for Plaintiff.

Gregory W. Moore, Christopher L. Riegler, and John P. Ryan II from Hall, Render, Killian, Heath & Lyman, Indianapolis, IN, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

SPRINGMANN, United States Magistrate Judge.

This matter is before the Court on a Motion for Summary Judgment [DE 42], filed by Defendant Porter Memorial Hospital ("the Hospital") on February 16, 2001; and a Motion for Summary Judgment [DE 47], filed by Defendant Michael W. Copollo ("Copollo") on February 26, 2001. For the following reasons, the Hospital's Motion for Summary Judgment is denied, and Copollo's Motion for Summary Judgment is denied.

## PROCEDURAL BACKGROUND

On February 4, 2000, the Plaintiff filed her Complaint in this Court, naming Porter Memorial Hospital and Michael W. Copollo, individually and in his official capacity, as Defendants, alleging violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000 et seq.), the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (enforceable through 42 U.S.C. § 1983), and the Violence Against Women Act (42 U.S.C. § 13981), and asserting various state law claims. The Complaint premises this Court's jurisdiction over the federal claims on 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. §§ 2000e–5(f)(1) and 13981 and over the pendant state law claims on 28 U.S.C. § 1367. On April 3, 2000, the Hospital and Copollo, in his official capacity, filed their Answer. On May 4, 2000, Copollo, in his individual capacity, filed his Answer.

On June 28, 2000, the Plaintiff filed a Motion for Voluntary Dismissal of Violence Against Women Act claim. On June 29, 2000, the Court granted the Motion, dismissing the Plaintiff's Violence Against Women Act claim.

On February 28, 2001, the parties filed a Stipulation of Dismissal of Defendant Copollo in His Official Capacity. On March 7, 2001, the Court granted the Stipulation, dismissing the Plaintiff's official capacity claim against Copollo.

On February 16, 2001, the Hospital filed its Motion for Summary Judgment, Brief in Support of Motion for Summary Judgment, Statement of Material Facts, and Index. On February 26, 2001, Copollo, proceeding pro se, filed his Motion for Summary Judgment, Memorandum in Support, and Statement of Material Facts. On March 30, 2001, the Plaintiff filed her Memorandum Opposing/Response. On May 1, 2001, the Hospital filed its Reply and Response/Reply to Plaintiff's Statement of Genuine Issues of Fact. On May 9, 2001, the Hospital filed its Supplemental Notice Regarding Its Reply. On May 24, 2001, the Hospital filed a Notice of Supplemental Authority in Support of Motion for Summary Judgment relating to the Title VII claim. On May 31, 2001, the Plaintiff filed a Notice of Supplemental Authority relating to the state law claims.

The parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. Pro. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may discharge its "initial responsibility" by simply " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325, 106 S.Ct. 2548; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n. 3 (7th Cir.1994); *Fitzpatrick v. Catholic Bishop*

*of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Intern. Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir.1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir.1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. F.R.C.P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir.1994). Federal Rule of Civil Procedure 56(e) establishes: "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid–America, Inc.*, 45 F.3d 231, 234

(7th Cir.1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir.1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *Doe*, 42 F.3d at 443.

### FACTUAL BACKGROUND

This case stems from an unfortunate incident in the workplace involving the Plaintiff and Copollo that has included allegations of sexual harassment and rape and culminated in Copollo's discharge and the Plaintiff's resignation.[1]

### A. The Parties

The Hospital is a non-profit, county-owned hospital and operates, in addition to the hospital facility, three ambulance station houses in and around Porter County, Indiana. As part of its service to the community, the Hospital routinely runs ambulance crews at each of its ambulance station houses. A crew is comprised of a paramedic and an emergency medical technician ("EMT") who work on the same ambulance during a given shift, which typically lasts twenty-four hours. The paramedic has authority over the EMT, has primary responsibility on an emergency run, and is in charge. A paramedic may direct patient care, give directives to the EMT, direct such things as the driving and cleaning of the truck, and decide when meals are taken. A paramedic also directs activities at the station house when the crew is not on an emergency call. Essentially, a paramedic directs all of the activi-

ties of the shift and is responsible for the actions of the EMT. A paramedic is "clearly higher ranking in terms of authority than the EMT" "with respect to the ambulance call and the responsibility of the vehicle." Choate Dep. at 33.

The Hospital hired the Plaintiff as a part-time EMT in June of 1996. When the Plaintiff began her employment with the Hospital, the Hospital employed Copollo as an EMT, but soon thereafter he became a paramedic.[2]

As part of her orientation, the Plaintiff participated in a training program that informed her of the Hospital's policies and procedures and the whereabouts of its Policies and Procedures Manual ("the Manual"). The Plaintiff was also provided with an Associates Handbook ("the Handbook") that contained a summary of the Hospital's sexual harassment policy.

### B. The Alleged Rape

On July 29, 1998, Copollo and the Plaintiff were partnered for a shift. While on duty, sexual intercourse occurred between the two in the north bedroom at Station Three. Later in their shift, the Plaintiff contacted a Hospital EMS employee who was on duty, Rachel Holland ("Holland"), and reported to her that Copollo had raped her. Holland contacted Bob Samanas ("Samanas"), Assistant Director of EMS and one of the Plaintiff's supervisors, to tell him of the Plaintiff's allegation of rape. Samanas called the Plaintiff and informed her that he was sending a truck to get her and bring her to Station One. Samanas then called Bill Choate ("Choate"), Director of EMS, and the two traveled to Station One where they interviewed the Plaintiff. The Plaintiff re-

---

1. Copollo is engaged in a separate lawsuit in which he has sued the Hospital for wrongful discharge and gender discrimination.

2. When the Plaintiff was hired, Copollo was an EMT. In February of 1997, Copollo completed a training course and became a certified paramedic. He continued as a paramedic until the time of his discharge.

stated the allegation that Copollo had raped her. Thereafter, Choate interviewed Copollo who admitted engaging in consensual sexual intercourse with the Plaintiff. Choate suspended both Copollo and the Plaintiff with pay until an investigation of the incident was completed.

As part of his investigation, Choate interviewed employees including Holland (twice), Beth McNeil, Michael Okray, Tom Feltner, Charlie Collins, and the Plaintiff. Choate's investigation was suspended, and Rick Tolson ("Tolson"), Vice President of Human Resources at the Hospital, and Bruce Behner ("Behner"), Vice President of Ambulatory Services, reviewed Choate's investigation notes. On August 10, 1998, Tolson and Behner terminated Copollo's employment.

In the meantime, the Plaintiff was on a leave of absence. She returned to work after Copollo's termination and worked a few shifts, but then she resigned. Copollo eventually faced criminal charges of rape and confinement, pled not guilty, and was acquitted by a jury of his peers.

### C. Other Conduct of the Parties

Prior to the alleged rape, the Plaintiff and Copollo had previously been partnered together for shifts. In May of 1997, during an eight hour shift when they were partnered together, Copollo visited with friends at the airport, and in the course of their discussion, Copollo talked about sex and listed for the Plaintiff persons with whom he wanted to have sex. During this incident, the Plaintiff was not touched in an offensive way nor was she included in the list of persons Copollo named. She did, however, feel uncomfortable and bothered by the comments. After this incident, the Plaintiff did not immediately report the incident but waited until she reviewed the new work schedule that was published a few weeks later.

When she realized she would be partnered with Copollo on that schedule, the Plaintiff made an oral complaint of sexual harassment to one of her supervisors, Shelly Barron ("Barron"). Barron told the Plaintiff, "I've had problems with Mike, too, and I understand how you feel, and we'll see what we can do with this." [3] Pl.'s Dep. at 79. Barron instructed the Plaintiff to report the incident to Samanas and that Barron would talk to Choate. On the same day, the Plaintiff reported to Samanas that she did not wish to work alone with Copollo. Samanas told the Plaintiff to trade shifts with another employee, and she did so. Shortly thereafter, Choate instructed the Plaintiff to file a formal complaint about Copollo's comments and to report additional conduct if it occurred.[4] The Plaintiff did not file a formal complaint about this incident because she believed the matter would not be kept confidential.[5]

The Plaintiff and Copollo were again scheduled to work together a few weeks

---

**3.** Barron testified that the Plaintiff told her that she was uncomfortable with Copollo because she had heard rumors about him having sexual relations with a minor and that her husband did not want her to work alone with Coppolo. The Plaintiff suggests in her submissions that Barron had knowledge of rumors about Copollo and that he had a nickname among his co-workers. Copollo apparently did have a reputation as a "big flirt" and was nicknamed "bald-headed baby f—er," presumably because of the rumors surrounding the 1991 incident. Barron acknowledged a general awareness of these things.

**4.** According to the Plaintiff, Choate told her that he was aware that Barron "had problems" with Copollo.

**5.** In her statement of facts, the Plaintiff contends she requested a "transfer." The Plaintiff's testimony is that she did not want to work "a shift" alone with Copollo. Pl.'s Dep. at 72.

after this incident. Copollo confronted her about why she did not want to work alone with him. The two discussed the airport incident as well as a rumor of a sexual incident involving Copollo and two minor girls that had occurred in 1991 and resulted in Copollo's arrest. Copollo explained his version of the incident to the Plaintiff and told her there was no sexual misconduct.[6] Following this discussion, the Plaintiff did not feel as threatened by him and felt that she had no choice but to work with him.[7]

## D. Incidents Not Involving the Plaintiff

Aside from the above incidents involving the Plaintiff, in March of 1997, an emergency room nurse reported to Samanas that Copollo threatened to kidnap her.[8] She averred that Samanas told her that it was not surprising and that this had happened before. Samanas indicated that he would talk to Copollo. Whether Samanas did speak to Copollo is not presented in the record.

During 1997 and 1998, Copollo made sexual advances and threats to other female employees. In August of 1997, he made sexual advances to Holland and threatened her. She did not report the incident because she did not want to spoil her chances for a full-time position. Another female employee was touched inappropriately and found him to be sexually suggestive. A different female employee was also touched inappropriately, received sexual advances, but did not report the incidents because a previous complaint by her did not receive satisfactory attention and consideration and because Copollo was a close friend of Choate. Copollo came into the bedroom of yet another female employee at a station house while she was sleeping and attempted to pull the covers down so he could see her. She requested a change of partners from Choate but did not describe the incident to Choate.

A male employee told Choate that he was concerned about the Plaintiff and another female employee working alone with Copollo. Another male employee asked Choate that he not be partnered with Copollo, and Choate indicated that he preferred to partner Copollo with male employees.

## E. Filing of Discrimination Charge

The criminal trial of Copollo was set to occur in August of 1999. The prosecuting attorney told the Plaintiff not to file any civil action until after the criminal case was concluded. When the August 1999 trial date was set aside, the Plaintiff contacted an attorney. Soon thereafter, on August 16, 1999, the Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") claiming sexual harassment. The EEOC dismissed her charge as un-

---

6. The Hospital employed Copollo at the time of his 1991 arrest. When the Hospital became aware of the arrest through a newspaper article, Copollo was suspended with pay. The Hospital's investigation was based primarily on what Choate read in the newspaper and Copollo's statements to Choate. Choate learned from Copollo that he was pleading guilty to contributing to the delinquency of a minor and furnishing alcohol to a minor. The newspaper article contained no allegations of sexual misconduct with the minors, and no Hospital personnel investigated the rumors of sexual misconduct that arose from the incident.

7. Prior to the alleged rape but on the same shift, the Plaintiff and Copollo visited a web site using the internet address <www.rotten.com> and viewed a webpage entitled "F—of the Month."

8. The nurse's Affidavit indicates that she was moving out of state, and Copollo did not wish her to do so. He told her as much and, in addition, informed her that he would kidnap her if he had to so that she would not move. She moved about a month after this incident.

timely but issued a Notice of Right to Sue letter. In turn, the Plaintiff filed this lawsuit against the Hospital.

## DISCUSSION

The Hospital requests that the Court grant summary judgment on all of the Plaintiff's claims against it. Copollo also requests that the Court grant summary judgment on all of the Plaintiff's claims against him.

### A. The Hospital's Motion

#### 1. Title VII Claim

The Hospital argues that the Plaintiff's claim of sexual harassment under Title VII must fail as a matter of law because the Plaintiff's Charge of Discrimination was untimely filed, and even if the Plaintiff had filed a timely Charge of Discrimination, her claim still fails as a matter of law. The Plaintiff responds that she filed a timely Charge of Discrimination with the EEOC and that factual disputes preclude summary judgment on the merits of her Title VII claim involving whether Copollo was the Plaintiff's supervisor at the time of the incident and whether the Hospital was negligent in failing to discover and remedy Copollo's harassment.

*a. The Plaintiff's Filing of Charge of Discrimination*

The Hospital contends that the Plaintiff's Charge of Discrimination was not filed within 300 days of the incident that put her on notice that she might have a Title VII claim against the Hospital and thus that her present Title VII claim is time-barred. In response, the Plaintiff admits that her charge was filed outside of the 300–day period but asserts that because the Hospital failed to conspicuously post a notice in the workplace describing her Title VII rights, her time for filing should be equitably tolled. The Plaintiff presented the following explanation to the EEOC in her Charge:

I did not file a charge before now because (i) I was informed by the prosecuting attorney not to initiate any civil action until the rape charge was disposed of, and (ii) I was unaware of the deadline for filing a charge of discrimination because my employer did not post a notice in the workplace, as required by 29 C.F.R. § 1601.30(a).

In spite of this explanation, the EEOC dismissed the Plaintiff's Charge as untimely filed.

■ Pursuant to 42 U.S.C. § 2000e–5(e), claimants have 300 days from an alleged discriminatory act to file a charge with the EEOC. Nevertheless, filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). The burden is on a plaintiff to establish that the statute has been tolled. *Butz v. Hertz Corp.*, 554 F.Supp. 1178, 1181 (W.D.Pa.1983) (citing *Swietlowich v. County of Bucks*, 610 F.2d 1157, 1162 (3d Cir.1979)).

■ Employers are required to post in conspicuous places notices of fair employment practices, including a description of applicable provisions of Title VII. 42 U.S.C. § 2000e–10 & 29 C.F.R. § 1601.30(a). Failure to post the required notice will toll the running of the limitation period, at least until such time as aggrieved persons seek out an attorney or acquire knowledge of their rights under the Act. *See Bonham v. Dresser Indus.*, 569 F.2d 187, 193 (3d Cir.1977). Thus, the filing period is equitably tolled "until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *McBrayer v. City of Mar-*

*ietta,* 967 F.2d 546, 548 (11th Cir.1992) (ADEA case) (quoting *Cocke v. Merrill Lynch & Co.,* 817 F.2d 1559, 1561 (11th Cir.1987)). "If employees are generally aware of their rights, however, ignorance of specific legal rights or failure to seek legal advice should not toll the [filing] period." *Id.*

■ In supporting her argument, the Plaintiff relies upon testimony by Choate that, although Department of Labor notices were posted throughout the various ambulance station houses, he could not recall specifically whether a Title VII notice was among them. The Plaintiff urges that, because the Hospital does not contest the allegation that it did not post a conspicuous Title VII notice, she has adequately established that it did not. In response, the Hospital argues that Choate's testimony does not prove that no notices were posted, only that he could not recall whether Title VII notices were included in the Department of Labor postings. More importantly, the Hospital has presented no evidence, in affidavit form or otherwise, that states affirmatively that Title VII notices were posted at the time the Plaintiff was employed there. Thus, viewing the facts in a light most favorable to the Plaintiff, the Hospital's failure to rebut the Plaintiff's allegation could lead to a reasonable inference that the Hospital did not post Title VII notices as it was required to do.

Moreover, the Court questions whether there is sufficient evidence that the Plaintiff was generally aware of her Title VII rights so that a reasonably prudent person in her position would have investigated those rights further, including the applicability of any filing deadlines. The Hospital does not present persuasive argument on this score. From her own statement in her EEOC Charge, it is clear that the Plaintiff contemplated a civil cause of action against some person or entity before

Copollo's criminal matter was resolved, but there is nothing to suggest that she specifically contemplated a Title VII action or that she was aware that her Title VII rights may have been violated by the Hospital (the only "person" she has sued under Title VII). Her statement implies that she contemplated filing a lawsuit against Copollo (not the Hospital) and that she was advised to wait until the criminal case was resolved. Accordingly, the Court finds that the Plaintiff's time to file an EEOC charge is subject to equitable tolling.

*b. The Plaintiff's Title VII Claim*

Title VII of the Civil Rights Act of 1964 provides in part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . .

42 U.S.C. § 2000e–2(a)(1). To be actionable, the offensive conduct must be based on one of the characteristics protected by Title VII, such as sex (meaning gender). 42 U.S.C. § 2000e–2(a)(1); *see also Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (Ginsburg, J., concurring) ("The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.").

■ Sexual harassment is a form of sex discrimination in the terms or conditions of employment that consists of efforts by either co-workers or supervisors to make the workplace intolerable or at least severely and discriminatorily uncongenial to members of a certain sex (hostile

work environment harassment) and of efforts (normally by supervisors) to extract sexual favors by threats or promises (quid pro quo harassment). *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751–52, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *DeClue v. Central Illinois Light Co.*, 223 F.3d 434, 437 (7th Cir.2000). When sexual harassment in the workplace alters the terms and conditions of someone's employment, it falls within the scope of the prohibition against sex discrimination in Title VII. *See Ellerth*, 524 U.S. at 752, 118 S.Ct. 2257. Although harassment must be severe or pervasive to impose liability on an employer for a hostile environment, one act of harassment may constitute an actionable Title VII claim when that one act is egregious. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir.2000). However, not all offensive workplace behavior violates the law. *See Smith v. Sheahan*, 189 F.3d 529, 532–33 (7th Cir. 1999) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (indicating that Title VII is not a general civility code); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir.1997); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995)).

To make a claim of sexual harassment, a plaintiff is required to follow the methodology established in the United State Supreme Court's recent trilogy of Title VII cases—namely, *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); *Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633; *Oncale*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201. This trilogy of Supreme Court cases, in which the Court abandoned the commonly used categories of quid pro quo and hostile environment harassment, reformulated sexual harassment cases in which the plaintiff alleges harassment by a supervisor and created a legal distinction relating to an employer's liability for actions taken

by supervisors culminating in tangible employment actions and those acts by a supervisor that do not result in a tangible employment action. *See Ellerth*, 524 U.S. at 761–65, 118 S.Ct. 2257 (citations omitted). When a plaintiff establishes that the supervisor's harassment culminated in a "tangible employment action," "such as discharge, demotion, or undesirable reassignment," the employer is vicariously liable. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 808, 118 S.Ct. 2275. When the supervisor's offensive conduct does not culminate in a "tangible employment action," a plaintiff may still establish a Title VII claim of harassment by establishing that the supervisor's conduct created an actionable hostile environment. *See Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. However, even if a plaintiff meets the requirements of a hostile environment claim, when no tangible employment action is taken, a defending employer may raise an affirmative defense comprised of two necessary elements: (1) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *Ellerth*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. Thus, if the alleged harasser is a supervisor and the victim suffered a tangible employment action, the employer is strictly liable, but if the alleged harasser is a supervisor and the victim suffered no tangible employment action, the employer is strictly liable for the supervisor's acts subject to an affirmative defense. *See Wolf v. Northwest Ind. Symphony Soc'y*, 250 F.3d 1136, 1142 (7th Cir.2001).

Under the methodology set forth in these cases, an employer's liability for hos-

tile environment sexual harassment depends upon whether the harasser is the victim's supervisor or merely a co-employee. *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1032 (7th Cir.1998) (citing *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275). If the harasser is merely a coworker, the employer is liable under a negligence standard, in which case the employer would be liable when the employer was negligent in either discovering or remedying the harassment. *Id.* An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees. *Id.* "[W]hen ... the only possible source of notice to the employer ... is the employee who is being harassed," the employee plaintiff "cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Zimmerman v. Cook County Sheriff's Dep't,* 96 F.3d 1017, 1019 (7th Cir.1996). Alternatively, a plaintiff may demonstrate that, even absent formal complaints, an employee's harassing conduct permeated the workplace so that the employer must have known of it. *See, e.g., id.* at 1018–19 ("The sheer pervasiveness of the harassment might support an inference that the employer must have known of it, ... as might a complaint from someone other than the victim."). Under either approach, however, courts must be mindful that "the law against sexual harassment is not self-enforcing," *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1014 (7th Cir. 1997), and without knowledge of an employee's harassing conduct, there is nothing an employer can do beyond the general policies and training to ensure compliance with Title VII, *Cooke v. Stefani Mgmt. Servs., Inc.,* 250 F.3d 564, 569 (7th Cir. 2001). "Mere office gossip and banter falls far short of establishing that [an employer] either condoned or licensed sexual harassment, nor would unsubstantiated rumors permit a reasonable person to conclude that such harassment was part of the 'ordinary course of business' [in the workplace]." *Jansen v. Packaging Corp. of Am.,* 123 F.3d 490, 549 (7th Cir.1997) (Coffey, J., concurring in part and dissenting in part).

Determining whether an employee is a supervisor as opposed to a mere co-worker has been a tricky business for courts, and one that the parties ask the Court to undertake here. *See Dinkins v. Charoen Pokphand USA, Inc.,* 133 F.Supp.2d 1254, 1265–68 (M.D.Ala.2001) (citing cases and discussing the complexity of determining an employee's supervisory status). In *Parkins,* the Seventh Circuit indicated that the understanding of the term "supervisor" must be guided by the common law of agency and the purposes of Title VII, discussed the essential attributes of a supervisor, and determined that "because liability is predicated on misuse of supervisory authority, the touchstone for determining supervisory status is the extent of authority possessed by the purported supervisor." *Parkins,* 163 F.3d at 1033. The court went on to conclude that a supervisor must have authority of a "substantial magnitude":

> [I]t is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an employee. Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes of imputing liability to the employer.

*Id.* at 1034. District courts within this Circuit that have examined the issue of supervisory authority in a Title VII case

since *Parkins* have relied upon it as controlling authority. *See, e.g., Gaskins v. Vencor, Inc.*, 2001 WL 300517, at *17 (S.D.Ind. Mar 26, 2001); *Harbison v. Prestige Group, Inc.*, 2001 WL 395786, at *22 (S.D.Ind. Mar. 16, 2001).

However, an EEOC guideline, which was published after the *Parkins* decision, states:

> An individual who is authorized to direct another employee's day-to-day work activities qualifies as his or her supervisor even if that individual does not have the authority to undertake or recommend tangible job decisions. Such an individual's ability to commit harassment is enhanced by his or her authority to increase the employee's workload or assign undesirable tasks, and hence it is appropriate to consider such a person a "supervisor" when determining whether the employer is vicariously liable.
>
> . . . . .
>
> An individual who is temporarily authorized to direct another employee's daily work activities qualifies as his or her "supervisor" during that time period. Accordingly, the employer would be subject to vicarious liability if that individual commits unlawful harassment of a subordinate while serving as his or her supervisor.

*EEOC Policy Guidance on Vicarious Employer Liability for Unlawful Harassment by Supervisors*, EEOC Notice No. 915.002 (June 18, 1999), *available in* 1999 WL 33103140 at *4. *See also Dinkins*, 133 F.Supp.2d at 1266 (finding *Parkins* unpersuasive in light of Supreme Court precedent and holding that "an employee is a supervisor or 'agent' for purposes of Title VII if he has the actual authority to take tangible employment actions, or to recommend tangible employment actions if his recommendations are given substantial weight by the final decision maker, or to direct another employee's day to day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks") (internal citations omitted). EEOC guidelines, while helpful because they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" and entitled to deference, are not controlling. *See Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 693 n. 7 (7th Cir.1998). *See also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

■ In this case, the Plaintiff argues that summary judgment is inappropriate whether Copollo is determined to be a supervisor or a co-worker. As to whether Copollo was a supervisor, the Plaintiff argues that evidence in the record demonstrates that Copollo had day to day control over the Plaintiff's work environment such as responsibility to manage emergency care when they were on call, responsibility for the EMS truck, and the ability to direct her daily activities as an EMT while inside the station house. The Plaintiff also points to Choate's testimony that paramedics are "in charge" during emergency runs and are clearly higher ranking in terms of authority than EMTs. These facts, she argues, establish that Copollo managed her daily activities and made him a supervisor under Title VII as the EEOC guideline instructs. As to whether Copollo was a co-worker, the Plaintiff argues that evidence in the record demonstrates that the Hospital knew or should have known that Copollo should not have been scheduled to work alone with female employees and was negligent in failing to discover and remedy Copollo's harassment.

The Court agrees with the Plaintiff. Although the Court is mindful of the Seventh Circuit's decision in *Parkins* and the EEOC guideline, the Court need not reject one or the other to rule on the Hospital's

Motion for Summary Judgment because there is sufficient evidence in the record from which a reasonable jury could find that the Hospital violated Title VII whether Copollo is determined to be a supervisor or a co-worker.[9] Thus, the Court finds that triable issues of fact remain as to Copollo's status as a supervisor or a co-worker. Whether Copollo is a supervisor or a co-worker, there is sufficient evidence in the record from which a reasonable jury could find that Copollo engaged in sexual harassment that was severe and/or pervasive,[10] that the Hospital failed to exercise reasonable care to prevent and correct promptly any sexually harassing behavior, and that the Plaintiff took advantage of preventive or corrective opportunities provided by the Hospital by reporting a harassment incident and attempted to avoid the harm by requesting that she not be assigned to work shifts alone with Copollo. Furthermore, there is sufficient evidence from which a reasonable jury could determine that the Hospital was negligent in responding to the harassment by Copollo in that it knew or should have known of Copollo's harassment (not simply that which was directed to the Plaintiff but to other female employees as well) and failed to remedy it. The Court, therefore, denies the Hospital's Motion for Summary Judgment as to the Plaintiff's Title VII claim.

## 2. Section 1983 Equal Protection Claim

The Hospital argues that the Plaintiff's equal protection claim must fail as a matter of law. The Plaintiff argues that a reasonable jury could find a custom or policy of acquiescence in Copollo's sexually inappropriate conduct in the workplace that culminated in the rape of the Plaintiff. The Plaintiff contends that the Hospital is particularly vulnerable here because its full sexual harassment policy was not given to EMS employees and because the evidence shows a reluctance to file formal complaints because of a lack of confidentiality, Choate's friendship with Copollo, and a general fear of reprisals.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured...." 42 U.S.C. § 1983. To establish liability under § 1983, a plaintiff must demonstrate that an unconstitutional action was part of an entity's policy or custom. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because entities cannot be held liable for Section 1983 claims under a theory of respondeat superior, *id.* at 690–91, 98 S.Ct. 2018, liability may only be imposed upon an entity for injuries inflicted pursuant to a government policy or custom, *id.* at 695, 98 S.Ct. 2018. "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the

9. Evidence in the record demonstrates that the employment situation involving paramedics and EMTs creates a unique set of circumstances—paramedics are partnered with EMTs and serve shifts as long as 24 hours; significant life activities such as sleeping and eating are performed during the shifts and at station houses; paramedics possess supervisory status and a significant measure of supervisory authority over EMTs on their crews; and during these shifts the crew (one paramedic and one EMT) may be the only personnel at a station house. Thus, evidence in this case suggests that paramedics do more than merely relay other officials' instructions and are delegated more authority than that confined to coordinating work projects of limited scope.

10. Although the Court is mindful that Copollo was acquitted of the rape charge in his criminal cases, the Court notes that the standards of proof vary depending upon whether the case is a criminal or civil case.

incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

Sexual harassment of female employees by a state employer constitutes sex discrimination for purposes of the Equal Protection Clause of the Fourteenth Amendment. *Bohen v. City of East Chicago*, 799 F.2d 1180, 1187 (7th Cir.1986). A plaintiff may demonstrate sex discrimination by showing that sexual harassment that is attributable to the employer under Section 1983 amounted to intentional sex discrimination, or by showing a conscious failure of the employer to protect the plaintiff from abusive conditions created by fellow employees amounted to intentional discrimination. *Id.* A practice of unconstitutional conduct that lacks formal approval may provide a basis for municipal liability if the plaintiff can establish that the policy-making authority acquiesced in a pattern of unconstitutional conduct. *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 511 (7th Cir.1993). A plaintiff may demonstrate a custom by showing knowledge of policy-making officials and their acquiescence in the established practice. *Id.* A plaintiff may prove that a policy has violated an individual's constitutional rights in three ways: (1) the existence of an express policy that when enforced constitutes a deprivation; (2) a widespread practice that, while not authorized by written law or an express policy, is so permanent and well-settled that it constitutes a "custom or usage" with the force of law; or (3) an allegation that the constitutional injury was caused by an individual with final policy-making authority. *McTigue v. City of Chicago*, 60 F.3d 381, 382 (7th Cir.1995).

The Plaintiff alleges that she was subjected to a sexually harassing work environment in violation of her right to equal protection and that the Hospital had a custom or practice of failing to protect employees from such sexual harassment. The Plaintiff points to several pieces of evidence including: the 1991 incident outside the workplace that resulted in a police investigation, criminal charges, an application for benefits from the Sex Crime Victim Services Fund that named Copollo as the suspect and that was completed by Hospital personnel, a plea of guilty by Copollo, and a suspension of Copollo during an incomplete investigation by the Hospital; the Plaintiff's request to a supervisor that she not be assigned to work alone with Copollo; incidents involving Copollo and several female Hospital employees, some of which were reported to the Hospital; and reports and requests by male employees to supervisors regarding Copollo's conduct toward female employees.

Although the Plaintiff has a substantial burden of proof to establish her Section 1983 claim, the Court finds that significant disputes remain regarding material facts related to her claim against the Hospital, including: Copollo's involvement in these incidents with various female Hospital employees, which apparently included threats, solicitations, and sexual advances; the extent to which the Hospital knew (or should have known) of these several incidents at the workplace and the incident outside the workplace; what the Hospital did or failed to do to address the problems and incidents; what the Hospital did or failed to do to protect employees; the extent to which the Hospital's sexual harassment policy was available and accessible; the Hospital's response or approach to sexual harassment complaints; and the extent to which the Hospital may have acquiesced in Copollo's conduct. Thus, the Court concludes that the Plaintiff has come forward with sufficient evidence to create triable issues of fact on her claim and that sum-

mary judgment is inappropriate at this time.

### 3. State Law Claims

Apart from her federal claims pursuant to Title VII and Section 1983, the Plaintiff has also brought state law claims for violations of the Indiana Constitution and negligent hiring, retention, and supervision. The Hospital requests summary judgment on the Plaintiff's state law claims.[11]

*a. The Plaintiff's Claim Under Article I, Section 23 of the Indiana Constitution*

The Hospital argues that the Court should grant summary judgment as to the Plaintiff's claim arising under Article I, Section 23 of the Indiana Constitution. The Hospital contends that this claim fails as a matter of law because the Indiana Supreme Court has not recognized such a cause of action and because no Indiana statute provides for such a claim. The Plaintiff responds that this Court recognized such a claim in *Discovery House v. Consolidated City, Indianapolis,* 43 F.Supp.2d 997, 1004 (N.D.Ind.1999). In its Reply, the Hospital does not take up this argument again.

The Plaintiff is correct regarding the law in the Northern District of Indiana.

In *Discovery House,* this Court held as follows on the issue:

[I]t is this court's duty to decide this issue as it believes the Indiana Supreme Court would, were it to do so. *Cf. Kutsugeras v. AVCO Corp.,* 973 F.2d 1341, 1346 (7th Cir.1992). Because this court believes the Indiana Supreme Court would recognize a claim for damages based on a violation of the Equal Protection Clause of the Indiana Constitution, Article I, § 23, Discovery House's claim for damages thereon will not be dismissed at this stage of the litigation.

43 F.Supp.2d at 1004. In reaching its holding, this Court acknowledged that the Indiana Supreme Court had not explicitly recognized an independent claim for damages for a violation of the Indiana Constitution, but that the Indiana Supreme Court had implicitly accepted that a party may sue for damages resulting from a violation of the Indiana Constitution, and that lower Indiana courts have held that actions for damages will lie for a violation of the Indiana Constitution or have assumed that to be the case. *Id.* (citing *Bayh v. Sonnenburg,* 573 N.E.2d 398 (Ind. 1991); *Hilburt v. Town of Markleville,* 649 N.E.2d 1036, 1041 (Ind.Ct.App.1995); *Orr*

---

**11.** The Hospital argues that the Plaintiff's state law tort claims are barred by the exclusivity provision of the Indiana Worker's Compensation Act. The exclusivity provision states:

> The rights and remedies granted to an employee ... on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, the employee's personal representatives, dependents, or next of kin, at common law or otherwise, on account of such injury or death, except for remedies available under I.C. § 5–2–6.1.

IND.CODE § 22–3–2–6. As the Plaintiff has indicated, this case does not involve personal injuries by accident. *See Hurd v. Monsanto Co.,* 908 F.Supp. 604, 608, 609–10 (S.D.Ind.

1995). Courts have recognized that the exclusivity provision does not bar an assortment of claims. *See, e.g., McCreary v. Libbey–Owens–Ford Co.,* 132 F.3d 1159, 1166 (7th Cir. 1997) (intentional infliction of emotional distress); *Tacket v. GMC,* 93 F.3d 332, 335 (7th Cir.1996) (emotional injuries); *Van Jelgerhuis v. Mercury Fin. Co.,* 940 F.Supp. 1344, 1368 (S.D.Ind.1996) (sexual harassment); *Perry v. Stitzer Buick GMC, Inc.,* 637 N.E.2d 1282, 1288–89 (Ind.1994) (racial harassment and claims for injuries that were not physical); *Coble v. Joseph Motors, Inc.,* 695 N.E.2d 129, 134 (Ind.Ct.App.1998) (intentional tort). For these reasons, the Court finds that the Plaintiff's state law claims are not barred by the exclusivity provision of the Indiana Worker's Compensation Act.

*v. Sonnenburg,* 542 N.E.2d 201, 205 (Ind. Ct.App.1989)).

In *Turner v. Sheriff of Marion County,* 94 F.Supp.2d 966 (S.D.Ind.2000), a federal judge in the United States District Court for the Southern District of Indiana expressed doubt regarding whether such an action was available under Indiana law but certified the following question to the Indiana Supreme Court: "Does a private right of action for damages exist to remedy deprivations of rights guaranteed by Article I, Section 11 of the Indiana Constitution?" *Id.* at 998. On March 8, 2000, the Indiana Supreme Court in cause number 94S00000CQ136 declined to answer the certified question. Soon thereafter, in *Boczar v. Kingen,* No. IP 99–0141–C–T/G, 2000 WL 1137713 (S.D.Ind.2000), another federal court in Indiana declined to recognize a cause of action for damages directly under the Indiana Constitution, holding that it is unlikely that the Indiana courts would recognize an implied right of action for damages under the Indiana Constitution. *Id.* at *25. That court reasoned that Indiana courts have been hesitant to recognize implied rights of action under Indiana statutory law and that it is unlikely that the framers of the Indiana Constitution intended a private cause of action for damages for constitutional violations because they would have understood sovereign immunity to bar such an action. *Id.* The court found persuasive the unpublished decision of another judge in the United States District Court for the Southern District of Indiana in *Craig v. Christ,* No. IP 96–1570–C–H/G (Dec. 15, 1998). *Id.* at *24.

Later in 2000, the Indiana Supreme Court reviewed a case having significant implications regarding the interpretation of Article I, Section 12 and Article I, Section 23 of the Indiana Constitution. *See McIntosh v. Melroe Co., a Division of Clark Equip. Co.,* 729 N.E.2d 972 (Ind. 2000). Article I, Section 12 of the Indiana Constitution provides: "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely, and without denial; speedily, and without delay." As to Section 12, the *McIntosh* court stated that the provision prohibits state action that deprives a person of a protectable interest without a fair proceeding. *Id.* at 975. The court also indicated that Section 12 prescribes procedural fairness and that, for civil litigants, it guarantees a remedy by due course of law for injuries to person, property, or reputation. *Id.* at 975–76. Although the court recognized that the legislature may identify those claims that are legally cognizable and modify or abrogate remedies available, including remedies available under the common law, the court did iterate that such legislation interfering with a right must bear a rational relationship to a legitimate legislative goal. *Id.* at 976. Furthermore, the *McIntosh* court explained that the procedure must be according to due course of law, that courts must be open to entertain claims based on rules of law, and that those rules of law can be derived either from the common law or prescribed by statute. *Id.* at 979. Article I, Section 23 of the Indiana Constitution provides that "[t]he General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." As to this provision, the *McIntosh* court reaffirmed the requirements of Section 23 that it had articulated in *Collins v. Day,* 644 N.E.2d at 80 (Ind.1994).

Although it would appear from the facts in the record that the Plaintiff had a protectable interest, the parties in their briefs have not sufficiently argued several relevant issues (for instance, whether the common law has provided such a cause of

action, what remedies are available, whether the legislature has limited the remedies available, what rules of law apply to this issue, or whether the protections afforded in Article I, Section 23 apply only to violations by the General Assembly through legislative classifications and not to violations by state actors generally). For these reasons, the Court finds that it is not appropriate at this time to grant summary judgment for the Defendant on the Plaintiff's claim under Article I, Section 23 of the Indiana Constitution.

*b. The Plaintiff's Claim for Negligent Hiring, Retention, and Supervision*

The Hospital requests that the Court grant summary judgment on the Plaintiff's Indiana tort claim for negligent hiring, retention, and supervision. The Plaintiff responds that the evidence is sufficient to raise a question of fact regarding whether the Hospital knew or should have known of Copollo's misconduct.

 Indiana law recognizes a cause of action for negligent hiring, retention, and supervision of an employee. *Grzan v. Charter Hosp. of Northwest Ind.,* 702 N.E.2d 786, 793 (Ind.Ct.App.1998); *Konkle v. Henson,* 672 N.E.2d 450, 454 (Ind.Ct. App.1996) (adopting the Restatement (Second) of Torts § 317 as the standard). When determining if an employer can be liable for negligent retention of an employee, a court must determine if the employer exercised reasonable care. *Grzan,* 702 N.E.2d at 793; *Konkle,* 672 N.E.2d at 454. To prevail on their claims, plaintiffs must show that the employer knew or had reason to know of the misconduct and failed

to take appropriate action. *Grzan,* 702 N.E.2d at 793; *Konkle,* 672 N.E.2d at 460.

 Given the police investigation and the application for benefits completed by Hospital personnel (which together provide evidence of sexual misconduct), the charges from the 1991 incident, the Hospital's awareness of them, and the fact that Copollo was still employed by the Hospital at the time of the 1998 incident with the Plaintiff, the Court finds that there is sufficient evidence to raise a genuine issue of fact regarding whether the Hospital was negligent in hiring, retaining, and supervising Copollo and whether it knew or should have known of Copollo's misconduct.[12]

**B. Copollo's Motion**

Defendant Copollo has also filed a Motion for Summary Judgment, arguing that the Plaintiff's claims under Title VII against Copollo must fail as a matter of law, that the Plaintiff cannot establish her Section 1983 claim against him, and that the Plaintiff cannot establish her state law claims.

**1. Title VII**

The Charge of Discrimination filed with the EEOC alleged discrimination by the Hospital, and the Plaintiff has not asserted a Title VII against Copollo. Title VII actions are against employers.

**2. Section 1983**

In his Motion, Copollo asserts that summary judgment is appropriate on the Plaintiff's Section 1983 claim against him because he was not a state actor. In

---

12. In its Brief in Support, the Hospital argues that it is not liable under the theory of respondeat superior. The Brief in Support and the Reply Brief are not clear as to which of the Plaintiff's claims the theory of respondeat superior may provide a defense. Presumably, the Hospital asserts the doctrine as to the Plaintiff's state law tort claims because the theory of respondeat superior does not apply in Section 1983 claims. Nevertheless, given that the claims, arguments, and facts are in dispute and still taking shape in this case, the Court finds it inappropriate to grant summary judgment at this time on the theory of respondeat superior.

response, the Plaintiff argues that Copollo can be held individually liable under Section 1983 because he undertook the challenged action while on duty as a government employee and in the government workplace.

 A successful Section 1983 action requires a plaintiff to show that she was deprived of a federal right by a person acting under color of state law. *Almand v. DeKalb County, Ga.,* 103 F.3d 1510, 1513 (11th Cir.1997). The misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken "under color of state law." *Monroe v. Pape,* 365 U.S. 167, 184, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Under certain circumstances, a rape of a person by a police officer or other state actor could violate the Constitution. *Almand,* 103 F.3d at 1513 (citing *Parker v. Williams,* 862 F.2d 1471 (11th Cir.1989) (involving rape by uniformed deputy sheriff of woman in his custody because of his representation that her bail had been revoked and that she would have to return to jail with him); *Dang Vang v. Vang Xiong X. Toyed,* 944 F.2d 476, 479–80 (9th Cir. 1991) (upholding jury's determination that defendant acted under color of state law when he, as employee of Washington State Employment Security office, raped women looking for employment when meeting with them under the pretext of providing services pursuant to his state job)). The pertinent question in such cases is whether the person "acts with authority possessed by virtue of his employment with the state," *Almand,* 103 F.3d at 1513 (citing *Edwards v. Wallace Cmty. College,* 49 F.3d 1517, 1522 (11th Cir.1995)), or, phrased differently, a person acts under color of law when the alleged bad acts are " 'made possible only because the wrongdoer is clothed with the authority of state law,' " *Hughes v. Meyer,* 880 F.2d 967, 971 (7th Cir.1989) (quoting *West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988)).

Under these standards, not all acts by state employees are acts under color of law; rather, the primary issue is whether the official was acting pursuant to power possessed by state authority or only as a private individual. *Id.* at 971–72. It is the nature of the act performed, not the clothing of the actor or even the status of being on duty, or off duty, which determines whether the actor has acted under color of law. *Stengel v. Belcher,* 522 F.2d 438, 441 (6th Cir.1975) (citation omitted). In determining whether an official was acting under color of state law, the nature of the specific acts performed must be considered. *See, e.g., Pickrel v. City of Springfield,* 45 F.3d 1115, 1118 (7th Cir.1995) (officer could have been acting under color of state law where he served as a private security guard at a McDonald's restaurant wearing his police uniform and badge, and arrested plaintiffs); *Layne v. Sampley,* 627 F.2d 12, 13 (6th Cir.1980) (question for jury whether officer acted under color of state law where he had authority under law to carry weapon, argument between plaintiff and officer arose as a result of officer's performance of his official duties on a prior occasion, and threats made to officer by plaintiff were communicated to the officer through police agency).

 Although this is a close question, given the Court's ruling above regarding Copollo's supervisory position as a paramedic, the fact that Copollo engaged in this conduct while on duty as a government employee and in the government workplace, and the many factual disputes that remain in this case, the Court finds that summary judgment is not appropriate at this time on this claim. The Court, therefore, denies Copollo's Motion for Summary Judgment on the Plaintiff's Section 1983 claim against him.

### 3. State Law Claims

#### a. The Plaintiff's Claim Under Article I, Section 23 of the Indiana Constitution

Copollo argues that the Plaintiff's claim under Article I, Section 23 of the Indiana Constitution should be dismissed as a matter of law. In support, Copollo reasserts arguments made as to his contention that summary judgment should be granted on the Plaintiff's Section 1983 claim against him in his individual capacity. The Court notes that the Indiana Supreme Court in *Collins v. Day*, 644 N.E.2d 72, indicated that the analysis under Article I, Section 23 of the Indiana Constitution is different than the analysis under the Equal Protection Clause of the Fourteenth Amendment. Copollo has not presented any arguments under that analysis or any other authorities. For this reason and the reasons mentioned in connection to the Court's analysis of the Hospital's request for summary judgment on this claim, Copollo's request for summary judgment on this claim is denied.

#### b. The Plaintiff's Other State Law Claims

The Complaint is somewhat vague on the other state law claims alleged by the Plaintiff. The Complaint alleges a claim for negligent hiring, retention, and supervision against the Hospital only, and thus no such claim is asserted against Copollo. The Complaint does assert a claim of sexual assault against Copollo. Copollo's main argument as to any of the remaining state law claims is that they should be dismissed on jurisdictional grounds. Because the Court has denied the Hospital's and Copollo's requests for summary judgment on the federal claims, the Court properly retains jurisdiction over the pendant state law claims. Copollo's request that the Court dismiss the remaining state law claims is denied.

### CONCLUSION

Based upon the foregoing, Porter Memorial Hospital's Motion for Summary Judgment [DE 42] is DENIED, and Michael W. Copollo's Motion for Summary Judgment [DE 47] is DENIED.