[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-12114

_____

Agency No. 04-117

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 24, 2010
JOHN LEY
CLERK

DAVID L. LEWIS,

Petitioner,

versus

U.S. DEPARTMENT OF LABOR,
ADMINISTRATIVE REVIEW BOARD,

Respondent.

_____

Petition for Review of a Decision of the
Department of Labor

_____

(February 24, 2010)

Before EDMONDSON, BIRCH and COX, Circuit Judges.

PER CURIAM:

Dr. David Lewis petitions this court for review of the final order of the U.S.

Department of Labor Administrative Review Board ("ARB") denying his whistleblower complaints against his employer, the U.S. Environmental Protection Agency ("EPA"), brought pursuant to the employee protection provisions of the Clean Air Act ("CAA"), 42 U.S.C. § 7622(a); the Safe Drinking Water Act ("SDWA"), 42 U.S.C. § 300j-9(i)(1)(A); the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9610(a); the Toxic Substances Control Act ("TCSA"), 15 U.S.C. § 622(a), the Federal Water Pollution Prevention and Control Act ("FWPPCA"), 33 U.S.C. § 1367(a); and the Solid Waste Disposal Act ("SWDA"), 42 U.S.C. § 6971(a). After reviewing the record and the parties' briefs and hearing oral argument, we AFFIRM.

## I. BACKGROUND

Lewis holds a doctorate degree in Microbial Ecology from the University of Georgia ("UGA") and has been employed at EPA since 1971.[1] At the time he filed his complaints against EPA and at all relevant times, Lewis worked as a GS-15 research microbiologist in the Ecosystems Assessment Branch ("EAB") of the Ecosystems Research Division ("ERD"). The ERD is part of the National Exposure Research Laboratory Division ("NERL"), which is a division of the

---

[1] In reciting the facts of this case, we borrow considerably from the Administrative Law Judge's ("ALJ") 9 June 2004 Recommended Decision and Order ("RDO") and the ARB's 30 March 2007 Final Decision and Order ("FDO").

2

Office of Research and Development ("ORD").  ORD is one of EPA's twelve program offices.[2]  At all times relevant to this case, either Dr. Paul Gilman or Dr. Norine Noonan was the Assistant Administrator ("AA") for ORD; Dr. Gary Foley was the Director of NERL; Jewel Morris was the acting Deputy Director of NERL; Dr. Rosemarie Russo was the Director of ERD; Dr. Harvey Holm or Dr. Robert Swank was the Research Director of ERD; and Frank Stancil was the Branch Chief of EAB.  Lewis' first-line supervisor was Stancil, his second-line supervisor was Russo, and his third-line supervisor was Foley.  Lewis did not report directly to either the AA for ORD or the EPA Administrator.  In December 1998, Lewis began working with UGA's Department of Marine Sciences under an Intergovernmental Personnel Act ("IPA")[3] assignment, which resulted from the settlement of a whistleblower complaint Lewis previously had filed against EPA. During the IPA, Lewis participated in a research project in Egypt, studied cross-infection of Hepatitis C and other pathogens in medical devices, and was engaged in research regarding human exposure to pathogens from dust or water due to the

[2] EPA is divided into twelve program offices and ten regional offices.  Each program office is headed by an AA.  All of the program offices report to the EPA Administrator and are expected to coordinate with one another if one office is working on science that affects another office.

[3] The Intergovernmental Personnel Act of 1970, 5 U.S.C. §§ 3371-3375, authorizes the head of a federal agency to arrange for the assignment of an employee of his agency to a state or local government "for work of mutual concern to his agency and the State or local government that he determines will be beneficial to both."  5 U.S.C. § 3372(a).

spread of sewage sludge on land.

Dr. John Walker is a GS-14 physical scientist in the Office of Waste Water Management ("OWWM"), which is a division of the Office of Water ("OW"). The OW is another one of EPA's twelve program offices. The Municipal Support Division ("MSD") is found within the OWWM, and the Municipal Technology Branch ("MTB") is within the MSD. Walker has no supervisory or managerial duties with respect to his position as a GS-14 scientist. Walker is also OWWM's quality assurance and quality control manager. In this capacity, he is tasked with evaluating EPA documents for suitability before they are disseminated to the public. Walker is supervised by Michael Cook, the Director of OWWM, and Charles Gross, the Branch Chief of MTB.

In 1984, EPA began drafting 40 C.F.R. § 503 ("Rule 503"), which provides guidance to states and industry on how to disinfect sludge generated during the treatment of domestic sewage and safely apply it to land. It has been EPA's policy to encourage the beneficial use of treated sewage sludge (also referred to as "biosolids") and to prevent restrictive local ordinances and bans on its use as crop fertilizer. See 40 C.F.R. § 503.1 (2009). Walker's job duties within OW, which is the program office responsible for providing regulation maintenance to Rule 503, include coordinating with individuals outside EPA who have questions or concerns about the biosolids program. He also serves as the head of the Biosolids Program

Implementation Team ("BPIT"), a group whose mission is to increase public acceptance of biosolids. Walker is a recognized authority on sewage sludge and is regarded by the biosolids industry as one of EPA's national biosolids spokesmen.

In 1996, Lewis became concerned that heavy metals in sludge may be adverse to the public health and that the effects of pathogens in the sludge were not adequately investigated during the Rule 503 peer review process. In 1998, Finnis Williams, an attorney for the Sierra Club, asked Lewis to be an expert witness in a wrongful death toxic tort case ("Marshall" or "the Marshall case") against Synagro Technologies, Inc. ("Synagro"), a company engaged in the land application of biosolids. EPA gave Lewis permission to serve as an expert witness so long as Lewis regarded his role as an outside activity.[4] In his expert opinion reports, Lewis criticized Rule 503 and stated that land application of biosolids may be harmful to the public health. Synagro also sought an expert witness from EPA for the Marshall case, but EPA declined to provide one.

In May 2001, Lewis completed a research article about Rule 503 entitled "Adverse Interactions of Irritant Chemicals and Pathogens with Land-Applied Sewage Sludge" ("*Adverse Interactions*"), which he hoped to have published in

---

[4] "Outside Activities" are activities that are not carried out during an EPA scientist's official duties but are along the lines of the scientist's work at EPA. When engaged in "outside activities," employees may refer to their EPA employment so long as they also provide their other biographical details and they must state that they are speaking as private citizens and not as representatives of EPA.

*Lancet*, a prestigious medical journal.  In the article, Lewis documented illnesses associated with biosolids and concluded that there was a link between land application of sewage sludge and risks to public health that ought to be thoroughly investigated with epidemiological studies.  The paper was cleared for submission to publication on 11 May 2001 and, on 20 May, Lewis submitted it to *Lancet* to undergo the journal's peer review process.  Lewis also provided a copy of *Adverse Interactions* to Holm, who decided that the article should be sent to Dr. James Smith, a Senior Environmental Engineer with ORD in the Cincinnati, Ohio office, and Chairman of the Pathogens Equivalency Committee, to review for biosolids issues.  Lewis forwarded a copy of the article to Smith on 31 May 2001, noting both in the cover email and on the draft itself that the article was confidential. Lewis asked that Smith limit his distribution of the paper to "appropriate individuals" within EPA.[5]  RE Vol. 1 at 46.

After Hugh McKennon, NERL's Associate Director for Health, ordered a formal EPA peer review of the article, Holm delegated the coordination of the peer review process to Smith.  Holm and Smith agreed that Smith would ask Robert Brobst and Robert Bastain, both of whom were members of Smith's Pathogen

---

[5] Because Lewis was at this time listed as an expert witness for the plaintiff in Marshall, Synagro received a copy of the manuscript of *Adverse Interactions*.  The trial judge placed the article under a protective order to prevent Synagro for disseminating it to the public prior to its publication.

Equivalency Committee, to serve on the peer review panel. Smith also asked Walker, who was present when Smith discussed the peer review with Brobst and Bastain, to participate in the review. Because Walker was technically qualified to review the article, neither Smith nor Walker believed that Walker's inclusion on the panel was problematic or created a conflict of interest. On 3 July 2001, Smith gave Brobst, Bastain, and Walker the article and instructed them to complete the review as soon as possible and to forward their findings to Holm. To effectuate his peer review, Walker forwarded a copy of *Adverse Interactions* to Dr. Patricia Millner, a microbiologist at the USDA, and asked her to provide him with review comments. He did not inform any of his supervisors that he had shared a copy of the article with Millner. Walker was aware that the paper was marked confidential, but regarded Millner as a colleague and believed her input would be helpful. With Millner's permission, Walker used her comments on *Adverse Interactions* as part of his peer review.

On 9 July 2001, Walker met with Robert O'Dette, the Executive Vice President of Government Relations, Compliance and Technical Services for Synagro. Both Walker and O'Dette were on the National Biosolids Partnership ("NBP") Committee and frequently met to discuss issues of interest to NBP. At the time of this meeting, the Marshall trial was underway in New Hampshire. Walker was aware of the case and knew that Synagro was troubled by Lewis'

7

involvement in it as an expert for the plaintiff.  According to O'Dette, Walker told him during this meeting that Lewis had submitted an article regarding the adverse effects of sludge on public health to *Lancet* for publication and that he, Walker, was conducting a peer review of the article.[6]  Walker also asked O'Dette to provide him with information about Synagro's biosolids-spreading operation to aid him in his peer review.[7]  Walker admits that he did not tell his supervisors that he was planning to request such information from Synagro.  Walker met with O'Dette again the following day to address Synagro's concern that its request to have an EPA scientist testify as an expert for the defense had been denied.  Alvin Thomas, counsel for Synagro, and Cook were also present.  According to Walker, they did not discuss Lewis' article at this meeting.

On 11 July 2001, Walker emailed his peer review of *Adverse Interactions* to members of his management chain, including Alfred Lindsey, the Deputy Director of OWWM, Smith, and Cook, as well as to Bastain and Brobst, with a cover letter stating that the article was of "poor quality" and "alarmist."  Id. at 50, 210-11.  Walker failed to cite Millner's input and conceded that his peer review was taken

_____

[6] Walker disputes that he used the term "peer review" or that he disclosed either the substance of the article or where it was being submitted for publication.

[7] According to O'Dette, Walker asked for this information during a 11 July meeting. Although O'Dette sent Walker a partial copy of a transcript of the Marshall trial, Walker subsequently informed Synagro that he was not going to use its input in drafting his peer review comments.

virtually verbatim from her comments. Walker did not discuss his review with Lewis' supervisors or anyone outside EPA and did not believe that sending his review to his supervisors would harm Lewis' reputation because they had no authority over Lewis' employment. That same day, Smith emailed his peer review, in which he concluded that the article presented a biased point of view and was only acceptable after major revision, to Holmes. Around the same time Walker and Smith submitted their peer reviews, *Lancet* rejected *Adverse Interactions* for publication, noting the need for an epidemiological study with a control group.

According to an affidavit O'Dette executed in conjunction with the Marshall case, he and Walker had dinner together on or about 18 July 2001, when they both were attending a biosolids meeting in Milwaukee. Walker did not inform his supervisors that he was meeting with O'Dette. During their visit, Walker discussed Lewis' article and told O'Dette that he and two other reviewers had been critical of it.

Upon learning of Walker's communications with Synagro, Lewis contacted Judy Vanderhoef in EPA's Office of the Investigator General ("OIG") to initiate an investigation of Walker's peer review. Lewis complained that: (1) Walker's review was unacceptable because it was not his own work; (2) Walker submitted his peer review to Smith without a copy of Millner's comments, and (3) Walker did not document his meetings with Synagro for the peer review record. Lewis

9

also initiated an OIG investigation of the peer reviewer selection process, alleging that Walker was not qualified to review *Adverse Interactions* because he does not have a scientific background in the subject matter of the article and because he had a conflict of interest.

On 1 August 2001, Lewis' attorney contacted EPA's Office of General Counsel ("OGC") and requested that it enjoin Walker from discussing Lewis' article or Walker's peer review with outside sources. Walker subsequently contacted the individuals with whom he had shared his peer review of *Adverse Interactions* and advised them that the paper was confidential. David Guerrero, an attorney in EPA's OGC, informed Lewis' attorney that Walker, Smith, Brobst, and Bastain had been reminded of Lewis' request that his paper be kept confidential. Guerrero stated that OGC would take no further action until the OIG investigation was completed.

Some time thereafter, Synagro, in response to Lewis' participation as an expert witness in the Marshall trial, generated a document (the "White Paper") criticizing Lewis' reputation as a biosolids expert and attacking his Rule 503 biosolids research. The White Paper stated that Lewis' opinions about biosolids were not supported by sound science and that Lewis lacked sufficient expertise to render a reliable opinion on the safety of biosolids. The White Paper also claimed that Lewis' biosolids activities were not sponsored by EPA, that he had not been

10

accepted as a scientific expert by any court of law, and that no peer review of his biosolids research had been undertaken. The White Paper did not, however, specifically refer to *Adverse Interactions*, nor did it discuss the negative internal peer reviews the article received. O'Dette emailed the White Paper to several people in the biosolids industry as well as a number of EPA employees, including Walker and Smith, on 21 September 2001.

Following Synagro's release of the White Paper, Walker learned from Carol Geiger, an attorney who at the time was representing Southern Waste, Inc., another biosolids company, that Lewis was scheduled to speak in his private capacity at an upcoming public hearing before the Board of Commissioners for Dawson County, Georgia ("the Board") on the issue of banning land application of biosolids. On 24 September 2001, Walker wrote a letter to Geiger, on EPA letterhead, advising her that EPA had no evidence that the land application of biosolids was unsafe and that a majority of the scientific community believed that Rule 503 was based on sound science. That same day, Walker forwarded a copy of the White Paper to Geiger.[8] Walker did not tell anyone in his supervisory chain of command that he was forwarding the White Paper to Geiger, even though he knew that Geiger intended to use both his letter and the White Paper against Lewis at the Dawson County

_____

[8] Although Walker testified that he did not read the White Paper prior to sending it to Geiger, the ALJ found that this "self-serving" statement was entitled to minimal weight. Id. at 57.

11

hearing. In addition to Geiger, Walker sent the White Paper to several other people, both inside and outside EPA.

Geiger, in turn, provided a copy of the White Paper and Walker's letter, along with another document indicating that EPA was responsible for furnishing Southern Waste with the White Paper, to the Board. During the hearing, which was attended by members of the UGA faculty, local attorneys, staff from Senator Zell Miller's office, State of Georgia representatives, and residents of Dawson and Franklin counties, Geiger orally presented Walker's letter and the White Paper and stated that EPA had provided both documents to Southern Waste.

The day after the hearing, Lewis reported Walker's distribution of the White Paper to OIG and attached Walker's peer review to his complaint as an exhibit. OIG promptly conducted an investigation into Lewis' allegations. On 12 October 2001, Vanderhoef, on behalf of OIG, wrote Lindsey a letter regarding Lewis' complaints about Walker's peer review activities and his distribution of Synagro's White Paper. Vanderhoef notified Lindsey that OIG had investigated Lewis' complaints and provided Lindsey with the information gathered during the investigation. She advised Lindsey that because he was Walker's designated management official, it was within his discretion to determine whether disciplinary action against Walker was appropriate.

Three days later, on 15 October 2001, Lewis filed a whistleblower complaint

12

with the Occupational Safety and Health Administration ("OSHA") against EPA based upon Walker's distribution of the White Paper and his meetings with O'Dette. He alleged that EPA discriminated against him when it "permitted Dr. Walker to continue collaborating with Synagro in his efforts to discredit [Lewis'] research" and failed to prevent Walker "from . . . work[ing] with the regulated industry toward the demise of [Lewis'] reputation, research and publication record and, ultimately, [his] employability in the field of biosolids research." RE Vol. 3 at 660-61; RE Vol. 1 at 59.[9]

Based on OIG's investigatory reports, Lindsey determined that Walker's "lack of sound judgment" in requesting information from Synagro for his peer review, advising O'Dette that he and the other members of the review panel had given *Adverse Interactions* negative peer reviews, and providing a copy of *Adverse Interactions* to Millner, warranted corrective action. RE Vol. 3 at 630. Consequently, Lindsey counseled Walker about his actions, required that Walker clear any official correspondence regarding Lewis' biosolids activities with his supervisors prior to release to persons or organizations outside EPA, and instructed

_____

[9] Although Lewis raised numerous additional claims in his whistleblower complaint, he limits his appeal solely to the issue of whether EPA is liable for Walker's allegedly retaliatory actions and thus has abandoned the remainder of the claims raised in the administrative proceedings below. See Harris v. United Auto. Ins. Group, Inc., 579 F.3d 1227, 1231 n.1 (11th Cir. 2009) (per curiam) (claims not raised on appeal are deemed abandoned); Anderson v. U.S. Dep't of Labor, 422 F.3d 1155, 1174 (10th Cir. 2005) ("An issue not included in . . . the statement of issues in the party's initial brief is waived on appeal." (quotation marks and citation omitted)).

Walker to contact Southern Waste's attorneys and inform them that his forwarding of the White Paper did not represent an approval or endorsement of the paper by EPA. Walker was not required to notify those in attendance at the Dawson County hearing or others to whom he forwarded the White Paper that EPA did not endorse it.

Per Lindsey's orders, Walker wrote a letter to Geiger on 11 December 2001 requesting that her law firm take steps to clarify that EPA did not provide Southern Waste with, nor approve of or endorse, Synagro's White Paper. Geiger responded, denying that her firm represented that EPA approved of or endorsed the White Paper and suggesting that if Walker believed that any persons present at the Dawson County hearing were under that misapprehension, then he should contact them personally and inform them of EPA's position. Walker forwarded Geiger's response to OGC and took no further action. Lewis contends that, at a minimum, EPA should have required that Walker send the letter he sent to Geiger to the Dawson County Board of Commissioners for it to distribute to those who were present at the hearing.

On 18 December 2001, Guerrero responded to Lewis' OSHA complaint. Guerrero conceded that Walker's interactions with Synagro "reflected a lack of good judgment," but denied that EPA had retaliated against Lewis for engaging in any protected activities. Id. at 629-36. Guerrero also clarified that Walker's

14

position at EPA "does not affect Dr. Lewis or his IPA assignment to UGA in any manner" and that EPA, upon being notified of Lewis' allegations, "took timely and appropriate action to review the allegations and issue an appropriate response." Id. at 631, 633.[10]

Following an investigation, OSHA concluded that Lewis' claims lacked merit. Lewis objected to OSHA's findings and requested a hearing before a DOL Administrative Law Judge ("ALJ"). The ALJ consolidated Lewis' complaints and held a hearing on 4-7 March and 9-11 April 2003. In his RDO, the ALJ assumed without deciding that Lewis had engaged in protected activity and that EPA knew about this activity,[11] but concluded that EPA was not liable because Walker had no

---

[10] In response to questions regarding the scope of Lewis' IPA assignment, Guerrero further informed OSHA that the assignment was "limited to work on pathogen contamination of medical or dental devices and the application of this work to environmental issues of concern[] to [EPA]" and that "[a]ny representation by Dr. Lewis that EPA agreed that his IPA assignment would allow him to conduct research primarily or significantly devoted to biosolids is incorrect." RE Vol. 3 at 635. Lewis received this letter on 29 August 2002 as a result of a discovery request and, believing that some of the representations made therein were false and tainted his credibility, filed an additional whistleblower complaint on 23 September 2002, alleging that EPA discriminated against him when it misrepresented the scope of his IPA to OSHA, communicated this misinformation to Synagro, and failed to correct Synagro's false statements about the scope of his IPA. We will not address these claims because Lewis failed to raise them either before the ARB, or in his petition for review. See Harris, 579 F.3d at 1231 n.1.

[11] In addition to writing *Adverse Interactions*, serving as an expert witness in the Marshall trial, and speaking at public hearings, Lewis also: (1) presented, in his official capacity as an EPA scientist, his biosolids research at the 1998 Annual Meeting and Science Innovation Exposition of the American Academy for the Advancement of Science; (2) authored an article in *Science News* in which he criticized Rule 503's failure to consider the risks that pathogens found in biosolids pose to human health; (3) testified at a 22 March 2000 U.S. House of Representatives Science Committee hearing regarding whether EPA harassed scientists and intimidated private citizens who were critical of Rule 503 and the science supporting it; (4) presented his biosolids research at the National Science conference; and (5) presented

authority over Lewis and because EPA promptly disciplined Walker once it became aware of his misconduct. The ALJ thus recommended that Lewis' complaints be dismissed. Lewis thereafter appealed the ALJ's decision to the ARB.

After explicitly finding that Lewis had engaged in statutorily-protected activity when he expressed his concerns about sludge fertilization and Rule 503,[12] the ARB found that Lewis' claims regarding Walker's distribution of Synagro's White Paper were due to be denied because there was no evidence: (1) that Walker's actions adversely affected the compensation, terms, conditions, or privileges of Lewis' employment with EPA; or (2) that Walker or other EPA managers intentionally disseminated damaging information about Lewis that precluded Lewis from securing other employment. The ARB declined to address Lewis' hostile work environment claim after finding that Lewis failed to allege, attempt to prove, or argue below that EPA intentionally harassed him because of his protected activity.

Lewis filed a motion for reconsideration with the ARB on 27 April 2007,

---

scientific data that did not support Rule 503 at a conference at Boston University.

[12] Although the ALJ assumed applicability of all six environmental whistleblower statutes under which Lewis filed his complaint, the ARB noted that Congress waived federal sovereign immunity only with respect to the employee protection provisions of the SWDA and CAA. Because EPA did not argue against, and Lewis did not argue specifically for, application of either statute, the ARB assumed coverage under the CAA.

and on 2 May 2007, he filed a motion to reopen the record, which the ARB denied on 29 February 2008. On 25 April 2008, Lewis filed the instant petition for review of the ARB's 30 March 2007 and 29 February 2008 final orders. Because the ARB had not ruled on Lewis' 27 April 2007 motion for reconsideration at the time he filed his petition for review, we agreed to hold the appeal in abeyance pending ARB's decision on that motion. On 30 June 2008, the ARB granted Lewis' motion for reconsideration after concluding that Lewis had in fact asserted a hostile work environment claim before the ALJ. The ARB denied this claim on the merits, however, after finding that, even assuming the complained of actions constituted harassment, Lewis failed to prove by a preponderance of the evidence that EPA harassed him because of his protected activities. Moreover, the ARB concluded, despite the "strong inference that Walker was retaliating against Lewis due to Lewis' position on sludge fertilization, EPA [wa]s not liable for Walker's actions" because Walker, who was a fellow employee in a different program office, did not supervise Lewis, and because EPA took prompt disciplinary action against Walker as soon as it became aware of his actions. RE Vol. 1 at 132.

On 14 July 2008, Lewis filed an amended petition for review to include the ARB's 30 June 2008 order dismissing his complaint. We removed the case from abeyance on 15 July 2008.

17

## II. DISCUSSION

We find as an initial matter that Lewis' petition for review was timely to appeal the ARB's 30 March 2007 order because his 25 April 2007 motion for reconsideration, filed within a reasonable time after the order, was effective to toll the appeal period. See, e.g., Macktal v. Chao, 286 F.3d 822, 825-26 (5th Cir. 2002) (absent a statutory provision to the contrary, an agency has inherent authority to reconsider its decisions so long as reconsideration occurs within a reasonable time after the first decision and would not be arbitrary, capricious, or an abuse of discretion). Although Lewis' motion for reconsideration was still pending before the ARB when he filed his first petition for review in this court on 25 April 2008, his petition, which was timely filed within sixty days of the ARB's 29 February 2008 order denying his motion to reopen the record,[13] became effective to appeal from the 30 March 2007 order once the ARB disposed of his motion for reconsideration on 30 June 2008. Lewis' 14 July 2008 amended petition for review, filed within sixty days of the ARB's 30 June 2008 order dismissing his claims, also was timely filed.

We further conclude that we have subject matter jurisdiction over Lewis' entire petition, even to the extent that the ARB's orders resolve claims brought

---

[13] Under the CAA, an aggrieved party must file his petition for review in the appropriate court of appeals within sixty days from the issuance of the DOL's final order. See 42 U.S.C. § 7622(c)(1).

pursuant to CERCLA.  Although CERCLA provides for exclusive direct review in the district court, see 42 U.S.C. §§ 9610(b), 9613(b), we may entertain the petition as a whole because the ARB's orders also resolve claims arising under statutes that permit direct review in this court, see 15 U.S.C. § 2622(c)(1) (TSCA); 33 U.S.C. §§ 1367(b), 1369(b)(1) (FWPPCA); 42 U.S.C. §§ 300j-9(i)(3)(A) (SDWA); 42 U.S.C. §§ 6971(b), 6976(b) (SWDA); 42 U.S.C. § 7622(c)(1) (CAA), and because the petition "involves a common factual background and raises a common legal question," Ruud v. U.S. Dept. of Labor, 347 F.3d 1086, 1090 (9th Cir. 2003); accord Anderson, 422 F.3d at 1157 n.3; see also Shell Oil Co. v. FERC, 47 F.3d 1186, 1195 (D.C. Cir. 1995) (holding that "where an agency order arising from a common factual background and addressing a common question of law relies on two statutory bases that give rise to separate paths for judicial review, the entire order should be reviewed in . . . the court of appeals").

Satisfied that we have jurisdiction over this petition, we now turn to its merits.  The only issue Lewis raises on appeal is whether the ARB erred in denying his retaliatory hostile work environment claim based on its finding that Walker's actions are not imputable to EPA.  He argues that EPA is liable for Walker's

19

actions because Walker performed those actions in his professional capacity and in furtherance of EPA's formal sludge policy.[14]

We review final decisions of administrative agencies in accordance with the standards set forth in the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706. See Fields v. U.S. Dep't of Labor Admin. Review Bd., 173 F.3d 811, 813 (11th Cir. 1999) (per curiam). Accordingly, we will not overturn an ARB decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or is "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E); see Fields, 173 F.3d at 813. In conducting our review, we "do[] not reweigh the evidence or substitute [our] judgment for that of the ARB, but review[] the entire record to determine if the decision reached is reasonable and supported by substantial evidence." Fields, 173 F.3d at 814. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." J.A.M. Builders, Inc. v. Herman, 233 F.3d 1350, 1352 (11th Cir. 2000) (quotation marks and citation omitted).

The CAA prohibits an employer from retaliating against an employee for engaging in "whistle-blowing" activities protected under the Act. See 42 U.S.C.

---

[14] We will not consider Lewis' argument regarding EPA's liability to the extent that it attempts to challenge EPA's placement of Walker on the peer review panel. The ARB already concluded in its FDO that any such claim was not actionable because the acts giving rise thereto occurred more than thirty days before Lewis filed his 15 October 2001 complaint.

§ 7622(a); see Sasse v. U.S. Dep't of Labor, 409 F.3d 773, 779 (6th Cir. 2005) ("To state a claim under the whistleblower provision of [the CAA], the plaintiff must establish that his employer retaliated against him because he engaged in a protected activity."). In order to meet his initial burden of establishing a prima facie claim of retaliation, Lewis must prove: "(1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action." Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1328 (11th Cir. 1998). There is no dispute in this case that Lewis has satisfied the first element of a retaliation claim. The question, rather, is whether Lewis suffered an adverse employment action when he was subjected to an allegedly hostile work environment in retaliation for his anti-Rule 503 activities.

Although we have not explicitly recognized a retaliation claim based on a hostile work environment, other circuits have held that subjecting an employee to a hostile work environment in retaliation for engaging in protected activity constitutes adverse employment action.[15] Assuming without deciding that Lewis'

---

[15] See Hussain v. Nicholson, 435 F.3d 359, 366 (D.C. Cir. 2006) ("[A] hostile work environment can amount to retaliation under Title VII."); Noviello v. City of Boston, 398 F.3d 76, 91-92 (1st Cir. 2005) ("[S]ubjecting a party to a hostile work environment in retaliation for protected activity may be actionable under . . . Title VII."); Williams v. Admin. Review Bd., 376 F.3d 471, 477 (5th Cir. 2004) (retaliation-based hostile work environment action not resulting in unfavorable personnel action is cognizable under the Energy Reorganization Act, 42 U.S.C. § 585); Ray v. Henderson, 217 F.3d 1234, 1245 (9th Cir. 2000) (hostile work environment is cognizable under the anti-retaliation provisions of Title VII); Richardson v. New York State

hostile work environment claim is actionable, we must determine whether he has satisfied the elements of such a claim based upon Walker's actions in distributing Synagro's White Paper and communicating with Synagro regarding Lewis' article.

To make out a hostile work environment claim, an employee must show, inter alia, "that the employer is responsible for such environment under either a theory of vicarious or of direct liability."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002) (Title VII context); see also Porter v. Erie Foods Intern., Inc., 576 F.3d 629, 634 (7th Cir. 2009) (to prevail on hostile work environment claim, plaintiff must demonstrate "a basis for employer liability").[16] "The basis of an employer's liability for [a] hostile environment . . . depends on whether the harasser is the victim's supervisor or merely a coworker."  Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 (3d Cir. 2009) (addressing an employer's liability for hostile environment sexual harassment). Although "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or

Dep't of Corr. Serv., 180 F.3d 426, 446 (2nd Cir.1999), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S. Ct. 2405 (2006) (retaliatory co-worker harassment may constitute adverse employment action so as to satisfy the second prong of the retaliation prima facie case); Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264 (10th Cir.1998) ("[C]o-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim.").

[16] The plaintiff also must show "that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment."  Miller, 277 F.3d at 1275.

successively higher) authority over the employee, . . . . [w]here the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable [only] if it knew or should have known of the harassing conduct but failed to take prompt remedial action." Miller, 277 F.3d at 1278 (quotation marks and citation omitted); see also Parkins v. Civil Constructors of Illinois, Inc., 163 F.3d 1027, 1032 (7th Cir. 1998).[17] Thus, even if a plaintiff can show that his employer had actual or constructive knowledge of the harassment, the employer's expeditious remedial response will exempt it from liability. See Parkins, 163 F.3d at 1032 (noting that "[a]n employer's legal duty in co-employee [sexual] harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of . . . harassment of its employees." (quotation marks and citation omitted)). Remedial action by an employer will relieve it of liability for the co-employee's harassment only if such action "is reasonably calculated to prevent further harassment." Knabe v. Boury Corp., 114 F.3d 407, 412 n.8 (3d Cir. 1997).

In this case, the ARB found that EPA was not liable for Walker's retaliatory conduct because Walker had no supervisory authority over Lewis and because EPA took prompt disciplinary action against Walker. Substantial evidence supports the ARB's conclusion. Lewis concedes that Walker was not in his chain

---

[17] An employer is charged with constructive notice of the co-worker's harassing conduct "where the harassment was so severe and pervasive that management should have known of it." Miller, 277 F.3d at 1278.

of command, but asserts that Walker's actions are imputable to EPA because Walker, whose policy-making responsibilities extended to ORD's research activities, was not merely a co-worker. This contention is without merit. We have held that "a 'supervisor' is not merely a person who possesses authority to oversee plaintiff's job performance but a person with the power directly to affect the terms and conditions of the plaintiff's employment." Bryant v. Jones, 575 F.3d 1281, 1299-1300 (11th Cir. 2009). It is uncontroverted in the record that Walker was in a different program office, was in a grade lower than Lewis, and had no power to affect the terms and conditions of Lewis' employment. Because Walker was not Lewis' "supervisor," EPA is only liable for his actions if it unreasonably failed to discover or remedy the harassment. That EPA had no actual knowledge of Walker's communications with Synagro regarding Lewis' paper or his distribution of the White Paper is undisputed. Even assuming Walker's harassing conduct was so severe and pervasive that EPA management should have known of it, the record nevertheless reflects that EPA took prompt remedial action: it initiated an investigation into Walker's activities immediately after Lewis contacted the OIG and, upon conclusion of the investigation, Walker's designated management official counseled Walker, instructed him to rectify the effects of his actions, and required that he obtain authorization from his supervisors before engaging in any future communications regarding Lewis or his research. Such disciplinary action

24

was reasonably calculated to prevent further harassment of Lewis by Walker.  In sum, we cannot conclude on this record that the ARB's decision finding that there was no basis for holding EPA liable for Walker's actions was either unreasonable or unsupported by substantial evidence.

### III. CONCLUSION

Dr. Lewis appeals the ARB's dismissal of his hostile work environment claim against EPA.  For the foregoing reasons, the decision of the ARB is **AFFIRMED.**